ALFRED JENKINS SHRIVER v. DRUID REALTY COMPANY.

*Contract for Loan—Necessitous Borrower—Hardship of Contract—Not Ground for Relief—Adequacy of Consideration—Question for Parties.*

Parties of sound mind and under no legal disabilities, not occupying fiduciary relations, are left free to made such contracts as to them seem wise, and neither courts of law or equity will interfere to reform or rescind such contracts, when there is no fraud, misrepresentation, mistake, undue influence, or fiduciary relation.                                    p. 390

Neither a court of law or equity will relieve a party from the harsh consequences of an improvident act, on the ground alone of inadequacy of consideration, unattended by other circumstances showing fraud, duress, undue influence, or fiduciary relations giving an advantage to the dominant party, but will leave the rights of the parties to be governed and controlled by the contract voluntarily and deliberately entered into.

pp. 390-395

That an apartment house company, in order to obtain money with which to increase the size of its building, with the hope of thereby changing a losing venture into a profitable one, not only gave a mortgage for the sum loaned to it, but also agreed to pay to the lender an exceedingly large premium, for the procurement of the loan, payable in instalments extending over a

number of years, did not justify the interposition of equity to relieve it from its contract, as being unduly harsh and extorted from it as a necessitous borrower.                    pp. 395-400

That the corporation delayed for eight years after making the contract before asking relief therefrom, and its acts of acquiescence and ratification during that period, were facts which lessened the force of its appeal to a court of equity.

pp. 400, 401

*Decided January 12th, 1926.*

Appeal from the Circuit Court of Baltimore City (SOLTER, J.).

Bill by the Druid Realty Company of Baltimore City against Alfred Jenkins Shriver. From an order overruling a demurrer to the bill, defendant appeals. Reversed.

The cause was argued before BOND, C. J., URNER, ADKINS, OFFUTT, DIGGES, PARKE, and WALSH, JJ.

*Charles McH. Howard,* for the appellant.

*Alfred S. Niles* and *Chester F. Morrow,* with whom were *Niles, Wolff, Barton & Morrow* on the brief, for the appellee.

DIGGES, J., delivered the opinion of the Court.

The appeal in this case is taken from an order of the Circuit Court of Baltimore City overruling the demurrer filed by the appellant, as defendant, to the appellee's bill of complaint. The grounds of the demurrer are want of equity and laches. The prayers of the bill are for an accounting and an injunction. The bill alleges, in effect, that Joseph Berman was in 1916 the owner of substantially all of the capital stock of a corporation called the Lyon Realty Company, which corporation was seised of a lot of ground in Baltimore City upon which it had erected a large apartment house known as the Riviera; that Berman had practically all his money invested in the capital of this corporation, and that

the investment appeared in 1916 to be possibly ruinous and certainly unprofitable; that Berman was advised and convinced that the only way that increasing pecuniary loss and ruin could be avoided was to increase the size of the Riviera by building adjacent apartments of the same general character and putting the whole under one management, thereby reducing overhead charges to such an extent as to convert an unprofitable and perhaps ruinous investment into one which would yield a substantial profit. Acting upon this conviction, and in order to be in a position to carry out his plan, Berman caused the incorporation of the Druid Realty Company of Baltimore, the plaintiff below (appellee here), which corporation is practically owned by Berman, he being the owner of all of its capital stock with the exception of ten shares belonging to his son and one share to his son-in-law. After having organized the appellee corporation, the first requirement in Berman's plan necessitated the expenditure of a large sum of money, and having practically none of his own, this required the borrowing of the necessary money on such terms as he could negotiate. With this end in view, he approached the defendant, who represented himself to be, and in fact was, in control of the money desired, this money belonging either to himself or to those for whom he had authority to act. The bill also alleges that the defendant knew the imperative need of the appellee obtaining the loan of the necessary funds to enlarge the then existing apartment house, or to build additional ones. The bill alleges that the defendant, when approached by the plaintiff, through Mr. Berman, agreed to furnish the plaintiff $246,600 of the money of which he had control as agent or trustee, at five per cent., and $8,400 of his own money at six per cent. The conditions upon which the loan was to be made were that the five per cent. money was to be secured by a first mortgage running (with some amortization) for twenty years, and that the six per cent. money was to be secured by a second mortgage running for the same time; that the plaintiff should pay the defendant personally, in addition to the principal

and interest on the money borrowed from him, the sum of $90,297.96 in instalments covering twenty years, this sum to be also secured by a second mortgage, without interest. There is a further allegation that the plaintiff, being impelled thereto by what it deemed were the necessities of its case, agreed to the terms dictated as above by the defendant, and that the money was lent and secured as above stated; that during the eight years elapsed between the lending of the money in the latter part of the year 1916 and the filing of the bill, the plaintiff has paid the defendant an amount of money equal to all the defendant personally loaned it, all interest thereon at the rate of six per cent. per annum, broker's commission at two and one-half per cent. upon the whole amount of money lent both by the defendant himself and those for whom he was the agent or trustee, and in addition thereto the sum of $16,464.00; but notwithstanding all these payments, the defendant is insisting upon the terms exacted by him when the money was lent, and under these terms the plaintiff is required to pay a further additional sum of $73,440.46 to be paid in instalments during the next twelve years. The plaintiff also alleges in its bill that the terms of this contract are harsh and oppressive, and that notwithstanding the passage of the Act of 1916, ch. 374, forbidding a corporation to set up the defense of usury, are so manifestly unfair, unreasonable and oppressive that a court of equity will relieve it from said contract upon its paying to the said defendant such an amount as may be found justly and equitably due. The plaintiff then asks for an accounting, and proffers itself ready to bring into court any sum that may be found due, but avers that the above allegations show that the defendant is already largely overpaid.

The substance of these allegations is that Berman was practically the sole owner of the Lyon Realty Co. and all of his money was invested in that company's stock, the whole of its assets being represented by an unprofitable apartment house known as the Riviera; that finding the operation of the Riviera unprofitable, Berman conceived the idea that if

he had more apartment houses, thereby lessening the overhead charges, he would be able to convert a losing venture into a profitable one.   With that end in view, he organized the Druid Realty Company (appellee here), and sought the defendant as one who would be in a' position to secure a loan for him of the necessary funds to acquire the ground and erect additional apartment houses; the defendant agreed to secure the necessary money, estimated to be $255,000, and did secure the major 'portion of this sum from friends or relatives, at the same time investing $19,600 under his control as trustee, and $8,400 of his individual money; the sum of $246,600 being secured by first mortgages on the property purchased and built upon, the mortgages to run for twenty years at five per cent., with amortization during this period, and the $8,400 furnished by the defendant individually with interest at six per cent., together with compensation for securing the loan amounting to $90,297.96, to be paid in instalments over a period of twenty years, without interest, secured by second mortgages on the same property purchased and built upon.   The bill in this case was filed more than eight years after the consummation of the agreement by the execution of the mortgages, and after the sum of $35,339.50 had been paid to the defendant in partial payments made at six months' periods in accordance with the terms contained in the mortgages.

The contention of the appellee is that it was a necessitous borrower; that the defendant was acquainted with the plaintiff's necessities and able to procure for it the money needed; that by reason of these conditions the defendant exacted a harsh and oppressive contract from the plaintiff, from the results of which a court of equity should grant relief.   There is no claim of actual fraud, misrepresentation, mistake, undue influence, fiduciary relation, or other common ground of equity jurisdiction, but the claim of the plaintiff is based upon the allegation that it was a borrower whose financial necessities were taken advantage of by the defendant in compelling an extortionate and oppressive contract.

The rule universally recognized is that parties of sound mind and under no legal disabilities, not occupying fiduciary relations, are left free to make such contracts as to them seem wise, and neither courts of law nor equity will interfere to reform or rescind such contracts, when there is no fraud, misrepresentation, mistake, undue influence, or fiduciary relation shown to exist. The case presents a claim for the reformation or cancellation of a contract entered into after time for calm deliberation on the part of one entirely competent to contract, upon the ground of alleged inadequacy of consideration, plus the alleged financial need of the plaintiff at the time when the agreement was made.

It is stated in *Brantly on Contracts,* sec. 29, and also in 1 *Williston on Contracts,* sec. 115, that "If the courts should pass upon the question of the adequacy of the consideration for the promise, it is obvious that they would be engaged in fixing prices and making bargains for the parties, a proceeding which would violate the fundamental principle, that there should be the utmost liberty in the making of contracts. Men are not wards of the courts, nor are they under legislative tutelage. They are presumed to be capable of making their own bargains. On the other hand, if an illusory consideration were sufficient to support a promise, then the rule requiring the existence of a consideration would have no force. Therefore the law requires it to be real, *i. e.,* something of value. There may be a qualitative but not a quantitative analysis of consideration. A stipulation in consideration of one dollar is just as effectual and valuable as a larger sum stipulated for and paid. When a thing is to be done by the plaintiff, be it ever so small, this is a sufficient consideration to support a promise to pay for it. The contracting parties must determine for themselves the value and benefit of the consideration as of the other constituents of their contract."

In the case of *Taylor v. Turley,* 33 Md. 500, being a suit on a note for $9,000 given in 1863, during the Civil War, and the money for which the note was given being paid to the

borrower in Confederate money, when subsequently a suit
was brought by the payee against the maker of the note,
the note providing that the repayment should be made in cur-
rent bankable funds, it being admitted that the maker was
competent to contract and that the note was given voluntarily,
it was argued that there was such a wide difference between
the value of the money received in 1863 and the money
which was demanded in repayment, that it constituted such
an inadequacy of consideration as would relieve *pro tanto*
the maker of the note.   In passing upon this situation this
Court held: "But it is urged that, however the parties may
have made their contract, that there is such inadequacy be-
tween the consideration and the amount to be paid, occa-
sioned by the subsequent events, that it would be unjust to
hold the maker bound.   Assuming the contract to be subsist-
ing, is there any force in this objection?   It was perfectly
competent for the parties to have made the note payable in
whatever currency they pleased, not prohibited by law. * * *
Whether he made a good or bad bargain, or received a full
equivalent for what he promised to pay, cannot affect the
legal character of his obligation.   Parties contracting must
determine for themselves the value and benefit of the consid-
eration, as of the other constituents of their contract.   It is
not the province of the courts to interfere with the natural
rights of parties to contract, and to exercise their own will
and judgment upon the subject; and they have the power
to estimate the value of the consideration and the benefits
to be derived from their contracts, where there is no incom-
petency to contract, no fraud or surprise, and no rule of law
is violated.   While there must be some consideration, other-
wise the contract is *nudum pactum,* it is sufficient if it be
slight, or may be valuable to the party promising.   Even in
equity, where contracts may be reformed, although a consid-
eration is necessary, when the agreement is not under seal,
inadequacy of consideration is no ground for impeaching a
contract—folly, weakness or want of judgment will not
necessarily defeat a contract.   *Chitty on Contracts,* 30, 31;

*Stewart v. State,* 2 H. & G. 114. It is certainly not the duty of courts to shape the contracts of parties, but to enforce such as the parties make. The contract must be construed by the natural and fair import of its terms, without reference to the hardship that it may visit on the parties. If persons voluntarily express themselves in writing, they are bound by the language employed, interpreted by all the evidence admissible for that purpose. *Brown v. Waters,* 2 Md. Ch. 201; *Wagner v. White,* 4 H. & J. 566; *Barney v. Smith,* 7 H. & J. 345; *Abbott v. Gatch,* 13 Md. 314."

In the case of *McShane v. Halzehurst,* 50 Md. 107, which was a bill in equity for the cancellation of a contract for the exchange of property in Howard County for Baltimore City property, the ground for revocation of the contract was fraud and misrepresentation, and also difference in the value of the property exchanged, creating an inadequacy of consideration. The Court, in dealing with the proposition of inadequacy of consideration, says: "We do not enter into any inquiry as to the relative value of the properties which formed the subject of exchange. There is a good deal of testimony on this subject, much of it conflicting. This is a question with which we have nothing to do. The appellee cannot be relieved from his contract merely because he may have made a bad bargain."

In *Drury v. Briscoe,* 42 Md. 154, it was said: "It is an established principle that any consideration, however small, will be sufficient, as a court of equity is willing to lay hold of any just ground to support an agreement. *Hannan v. Towers,* 3 H. & J. 147."

In *Gluck v. Baltimore,* 81 Md. 315, in dealing with the question of applying legal rules which in particular cases may result in hardship, the Court said: "As said by Rolfe, B., in *Winterbottom v. Wright,* 10 M. & W. 115: 'Hard cases, it has been frequently observed, are apt to introduce bad law.' And in *Abbott v. Gatch,* 13 Md. 314, and in *Taylor v. Turley,* 33 Md. 500, this Court declined to permit considerations of great hardship to influence the rigid enforcement of

established legal principles. Obviously, a principle, if sound, ought to be applied wherever it logically leads, without reference to ulterior results. That it may in consequence operate in some instances with apparent or even with real harshness and severity does not indicate that it is inherently erroneous. Its consequences in special cases can never impeach its accuracy."

In 13 *C. J.* 365, the principle is stated: "So long as it is something of real value in the eye of the law, whether or not the consideration is adequate to the promise, is generally immaterial in the absence of fraud. The slightest consideration is sufficient to support the most onerous obligation; the inadequacy, as had been well said, is for the parties to consider at the time of making the agreement, and not for the court when it is sought to be enforced. It is competent for the parties to make whatever contracts they may please, so long as there is no fraud or deception or infringement of law. Hence the fact that the bargain is a hard one will not deprive it of validity"; and at page 366: "In Equity—Mere inadequacy of consideration, unless it is so gross as to shock the conscience and amount, in itself, to conclusive evidence of fraud, is not of itself a ground on which a court of equity will refuse to decree specific performance of a contract or recind it for fraud or undue influence"; citing in support of that statement *Feigley v. Feigley,* 7 Md. 537.

This latter was a case of a bill in equity on behalf of the wife to set aside a conveyance, made by the husband to his sister, of all his interest in his father's estate, on the ground of fraud on her rights to alimony in divorce proceedings, and upon the further ground of inadequacy of consideration moving from the sister to her brother, the complainant's husband. This Court, after finding that there was no direct evidence in the record as to the fraudulent participation of the sister in the transaction, other than the mere inadequacy of consideration contained in the deed, held that the conveyance of the husband's interest, shown to be worth $800, in consideration of $200 paid him by the sister, "is not such a

glaring inadequacy as, of itself, to stamp the transaction with fraud, by shocking the common sense of honesty, and thereby to render the deed void."

In *Guerand v. Dandelet*, 32 Md. 561, we said: "Whether the consideration for the restraint is adequate or not, is a question that the court will not inquire into. It is sufficient that the contract shows on its face a legal and valuable consideration; but whether adequate or inadequate to the restraint imposed, must be determined by the parties themselves, upon their own view of all the circumstances attending the particular transaction. If it were otherwise, it would be the court and not the parties, that would make the contract. All that the court is required to do, in passing upon the validity of the covenant, is to determine whether the restraint is reasonable and consistent with law, and whether there be legal consideration to support it." *Goodwin v. White*, 59 Md. 503; *Lawson v. Mullinix*, 104 Md. 156, at page 168.

In the case last cited, Judge Boyd, speaking for the Court, said: "In *Young v. Frost*, 5 Gill, 287, our predecessors said: 'A court of equity does not affect to weigh the actual value, nor to insist upon the equivalent in contracts, where each party has an equal competency. When undue advantage is taken, it will not enforce that. Improvidence or inadequacy do not determine a court of equity against decreeing specific performance.' The same thing was said in *Shepherd v. Bevin*, 9 Gill, 32, and the Court, after referring to cases cited, said: 'None of them assert that inadequacy of price alone, unattended by fraud or circumstances of suspicion, was ever declared sufficient ground to avoid a contract in other respects regular. On the contrary, the parties have a right to make their own contracts, and the mere inadequacy of price is no ground of objection, where the contract is fair and voluntary.' "

It follows from these authorities that neither a court of law or equity will relieve a party from the harsh consequences of an improvident act, on the ground alone of inade-

quacy of consideration, unattended by any other circumstances showing fraud, duress, undue influence, or such fiduciary relations between the parties as would give to the dominant party an advantage growing out of the transaction, but will leave the rights of the parties to be governed and controlled by the contract voluntarily and deliberately entered into.  If there is a legal valid consideration for such a contract, the parties to it are the judges of its adequacy, and when that contract is signed, they must be held to have thereby determined that the consideration named is adequate.

The appellee contends that the above principles do not apply to the present case, because it was a necessitous borrower, and, occupying this position, it was placed in a condition of duress, which gave to any lender to whom it might apply for money a position of undue influence which enabled the lender to drive a harsh, extortionate and unconscionable bargain.  The appellee has cited a number of cases of other jurisdictions, both in England and in this country, in support of this contention.  Admitting that the cases cited substantiate the contention of the appellee, but without in any manner indicating that in an analogous case we would feel compelled to follow them, we do not think the appellee here occupies the position of a necessitous borrower, such as those in the cases cited.  We here have a man who owned practically all of the stock in a corporation engaged in operating an apartment house which had proved unprofitable, and then organizing a second corporation, of which he also is practically the sole owner, for the purpose of acquiring land and building and operating additional apartment houses.  At the time of the application by the second corporation for the loan involved in this case, it was under no pecuniary obligation to anyone; but disregarding this technicality, and considering the two corporations, the Lyon Realty Company, and the Druid Realty Company, while being distinct legal entities, as, in fact, being Joseph Berman, we do not think that the appellee occupies such a position as would entitle it to relief in equity from its deliberate contract.  Its neces-

sity, at the time of making the contract, was in no way different from thousands of individuals borrowing money to begin business operations, or thousands of others who had expended all available funds in a business venture which up to that time had proved unprofitable, and who believed that the borrowing of additional money to extend or enlarge the business would convert it into one of profit. If all persons under like conditions were permitted to induce others to furnish the necessary capital upon promises of large returns embraced in deliberate and solemn contracts, and could, when the business made possible by the increased capital proved successful, apply to a court of equity and gain relief from all liability except what the services rendered were reasonable and fairly worth, our chancery courts would find time to do little other than try and consider such cases, treating all such borrowers as its wards and reforming all of their contracts upon the basis of what the court might think was reasonable and fair. In other words, if one having money to loan is applied to, to finance another in an uncertain and hazardous venture, where the borrower has demonstrated its hazard by making a failure of a like enterprise up to that point, and knew that the contract for a large profit to the lender, if the business was successful, would then be reformed so as to allow only what the service was reasonably worth, and in case of failure of the enterprise he would receive nothing for his services, the inevitable result must be that no money could be secured for hazardous or venturous enterprises. Such action by the court would render it impossible for persons in pecuniary distress to obtain financial assistance, which, in cases occurring every day in the financial and business world, has enabled those same borrowers to recoup their losses and ultimately attain financial and business success.

In the case of *Pennybacker v. Laidley,* 33 W. Va. 624, it was said: "In reference to contracts of hazard, the factor of risk and hazard is such a disturbing element in the estimation of value that courts of equity, when inadequacy alone

is in question, will refuse to interfere." In *Colonial Trust Co., admr., v. Hoffstott,* 219 Pa. 497, a case not unlike that now under consideration, the contract provided that the defendants were to procure for Jutte a loan of $200,000 for a year to enable him to pay off his most pressing debts and tide him over the crisis. For this he was to pay six per cent. commission and six per cent. interest, to put up all his industrial stocks and bonds as security, and give defendants one-half of whatever C. Jutte & Co. should be worth after he should get back the money he had put into the concern, taking the amount, however, in bonds instead of cash. This contract was attacked by Jutte on the ground, among others, that advantage was taken of his financial distress, amounting to equitable duress, to extort oppressive and unconscionable agreements from him. In passing upon this contention the court said: "He went to the defendants for help, and securing themselves by all available assets he had, they gave him help, thereby taking a big risk for the chance of a big profit. It was a transaction such as the financial world, in which both parties moved, is doing every day."

It must be remembered that the appellant here was in no way responsible for the needy financial condition of the appellee, and, so far as the record discloses, never before the making of the agreement in this case had any business or financial relations with the appellee or Joseph Berman. In *French v. Shoemaker,* 14 Wall. 314, at page 333, the Court says: "Enough appears in the record to convince the Court that the respondent was in straitened circumstances, that his business affairs had become complicated, that he was greatly embarrassed with litigations, and that he was in pressing want of pecuniary means, but the Court is wholly unable to say that the complainant is responsible for those circumstances, or that he did any unlawful act to deprive the respondent of his property, or to create those necessities or embarrassments, or to compel him to do what he acknowledges he did do, which was to yield to the pressure of the circumstances surrounding him, and as a choice of evils

accepted the advance of $5,000 and the shares assigned him in the new organization as proposed, and voluntarily signed both the agreement and the assignment. Such an act as that of signing those instruments, under the circumstances disclosed in the record, must be regarded, both in equity and at law, as a voluntary act, as it was unattended by any act of violence, or threat of any kind, calculated in any degree to intimidate the party or to force the result, or to compel that consent which is the essence of every valid contract. Suppose he consented reluctantly, as he avers, still the fact is that he did consent when he might have refused to affix his signature to the instruments, as he had repeatedly done for the year preceding; and having consented to the arrangement and signed the instruments, he is bound by their terms, and must abide the consequences of his own voluntary act, unless some of his other defenses set up in the answer have a better foundation."

The subject of what are technically known as "catching bargains," according to the authorities, relates to a very limited doctrine of the English courts of chancery, which was repealed by statute in that country, and has been the subject of only a few decisions in any of the states in this country. The appellee contends that these cases are authority for a special rule which should be applied in cases of needy borrowers. This doctrine was confined to bargains made with prospective heirs, reversioners and persons having future and contingent interests in estates, by money lenders and purchasers of such interests. In such cases it became the established doctrine of courts of chancery that fraud or duress would be presumed from inadequacy of consideration, and the burden was placed upon those engaged in such transactions to show that their contracts were just and reasonable. It is apparent that the appellee does not occupy the position of such a borrower, and we do not find it suggested in any of the cases that this rule should be extended to include borrowers generally. As above pointed out, the appellee entered into this contract after full deliberation, and in addi-

tion to that, it acquiesced in and ratified its terms and conditions by making semi-annual payments to the appellant for more than eight years after the consummation of the contract, or for such a length of time as enabled it to determine whether the operations engaged in would prove successful. It could have instituted this proceeding, if it so desired, immediately after the execution of the mortgages, as it had at that time as full and complete knowledge of their contents and the meaning of their provisions as when it filed the present bill. It will therefore be seen that the appellee, by at least twelve separate and distinct acts, as shown by the payments, acquiesced in and ratified the contract. If it had taken its present action immediately after the signing of the contract, and the court had granted its prayer by reforming the contract, it would have had to pay the appellant what his services were reasonably worth, without regard to whether the venture was a success or failure. This it did not desire to do, for the reason that under the contract as it then stood, and now stands, if the venture had proved a failure it would have had to pay, and the appellant would have received, nothing for his services.

Looking at the whole case, as disclosed by the record, it resolves itself into a situation similar to one in which the appellee had gone to the appellant, told him of his financial status and the condition of his business operations, and then said: "I think there is a chance of my recovering from my present difficulties by building and operating additional apartment houses, and if you will obtain sufficient capital for that purpose, to be secured by first mortgages for the full value of the property, I will make you a sharer in the profits of the business to the extent of the money set out in the contract and mortgages, if it is a success; but if not, although the money loaned will be secured, you will receive nothing for your services." This is such a proposition as is made and accepted in the business and financial world every day, and does not create such a case as would entitle the borrower to equitable relief. The compensation to the appellant was not

to be paid in cash, but was extended over a period of twenty years and conditioned upon the business and financial success of the appellee, running for this period without interest. The large majority of the money obtained for the appellee was at five per cent., one per cent. less than the legal rate of interest, and probably less than the appellee could have expected to obtain money for, upon the security which it had to offer; that is to say, a mortgage for the full cost of the land and buildings upon which the mortgage was a lien; and this is pointed out as being valuable service rendered by the appellant. The reply of the appellee is that a court of equity should not lend its ear to such a plea when made by a trustee in respect to trust funds under his control. Conceding this to be a correct statement of the equitable principle, nevertheless the record discloses that of the sum of $255,000 secured for the appellee, only a relatively small portion thereof were funds in the hands of the appellant and his cotrustee. And again, admitting the rule as contended for by the appellee to be sound, it cannot be heard to complain, as it had no interest in the trust funds or the rate at which same were invested.

The question of usury does not properly enter into a consideration of the case, for the reason that by the provisions of chapter 374 of the Acts of 1916, now codified as section 131 of article 23 of the Code, "No corporation shall hereafter interpose the defense of usury in any action at law or in equity." This section was applied by this Court in the case of *Penrose v. Canton Bank,* 147 Md. 200, and in the later case of *Carozza v. Fed. Finance and Credit Co.,* 149 Md. ·223, in which case it was held that this section was constitutional and that under its provisions no corporation could plead usury.

As stated, this bill was filed more than eight years after the contract was entered into, and the appellee does not undertake to explain this long and unreasonable delay in filing the bill; and while it may be open to argument as to whether or not this delay has injured the appellant, or has

brought about any change in the position of the parties detrimental to the appellant, yet this long unexplained inaction on the part of the appellee, together with acts of acquiescence and ratification during the whole period, are facts which lessen the force of an appeal to a court of equity. However, in the view we take of the case, it is unnecessary to pass upon the question of whether there has been such laches as would be a bar to the appellee's claim, because we have determined that even though the bill had been filed with promptness, it does not present a case in which equity will relieve.

It follows that the lower court erred in overruling the demurrer to the bill of complaint and that same should have been sustained and the bill dismissed.

> *Order overruling the demurrer reversed, and bill dismissed, with costs to the appellant.*