SHILLMAN, ET AL. *v.* HOBSTETTER, ET AL.

[No. 182, September Term, 1967.]

*Decided May 9, 1968.*

The cause was argued before HAMMOND, C. J., and HORNEY, MARBURY, BARNES, McWILLIAMS and SINGLEY, JJ.

*Leslie M. Pittler,* with whom were *Robert L. Sullivan, Jr.,* and *Sullivan & Pittler* on the brief, for appellants.

*Thomas R. Brooks,* with whom were *Robert J. Schick* and *Machen & Brooks, Richard C. Rice* and *Cory, Boss & Rice, Richard G. Anderson* and *Thomas M. Schifanelli* on the brief, for Charles R. Hobstetter, et al., part of appellees; submitted on the brief by *Stephen H. Sachs, United States Attorney,* and *Alan B. Lipson, Assistant United States Attorney,* for United States of America, Federal Housing Commissioner, et al., etc., other appellees.

BARNES, J., delivered the opinion of the Court.

The principal question in this appeal involves the right of the appellees, contract purchasers of dwelling properties in Section 12 of Maryland City, to sue and recover as donee beneficiaries on a contract signed by the appellants.

The case is an interesting one and for the most part the facts are substantially undisputed. The Maryland City Corporation (developer), a Maryland corporation, was the developer of a large housing development, commonly known as "Maryland City," located off Route 198 in Anne Arundel County. The development proceeded by the erection of houses in various sections, the whole proposed development consisting of Sections 1 to 14. Fifty-nine contract purchasers entered into contracts with the developer in which, *inter alia,* it was agreed that the developer for the considerations stated in the respective contracts would construct houses for them in Sections 9, 10 and 11. In accordance with the provisions of the contracts, each of the contract purchasers paid deposits in varying amounts to the developer.

In order to finance the development, funds were borrowed by the developer from Weaver Bros., Inc., and the borrowed funds were secured by a deed of trust in the nature of a mortgage on the property. In addition to handling the construction financing, Weaver Bros. processed the applications of all purchasers of individual lots located in Sections 1 through 12 of

the development who desired insured purchase money mortgages of the Federal Housing Administration (FHA). In accordance with these applications, FHA granted conditional and final commitments to insure mortgage loans of purchasers of lots and homes in Sections 1 through 12. When conditional commitments on each section were granted by FHA, the mortgagee, Weaver Bros., would advance funds theoretically to cover the costs of the construction of the homes to be built in each applicable section.

In May, 1964, the developer began to encounter financial difficulties of which both Weaver Bros. and FHA were aware. When the developer applied for a conditional commitment for Section 12, FHA acting through its state director, Charles H. Borcherding, Sr. (Borcherding), on April 15, 1964, advised Weaver Bros. by a letter of that date to Douglas Buttner (Buttner), its vice-president, that eight requirements must be satisfied before FHA would approve conditional commitments for Section 12. By a letter, dated May 6, 1964, from E. Harvey Kayne (Kayne), president of the developer, to Joseph W. Maguire, Operations Commissioner of FHA for Zone 1, the eight requirements were considered at some length. FHA, by a letter dated May 11, 1964, informed the developer that if the construction of the houses located in Sections 9 and 10 were completed by the developer, FHA would issue conditional commitments on Section 12.

During the week preceding May 27, 1964, a meeting was held with the appellants Miller, Shillman and Harms and representatives of FHA and Weaver Bros. to discuss the question of conditional commitments by FHA. All of the appellants were minority stockholders of the developer. The appellant Harms was also a creditor of the developer in the amount of approximately $72,000.00. The appellant Shillman was a principal in States Engineering Corporation, a supplier of building materials to which the developer was heavily indebted. Miller was secretary of the developer. At this meeting it was agreed that if the appellants would guarantee the refund of deposits made by the contract purchasers in Sections 9, 10 and 11, FHA would issue conditional commitments for Section 12. This was evidenced by a letter, dated May 27, 1964, signed by the appellants, di-

rected to Borcherding as state director of FHA, with a copy to a representative of Weaver Bros. This important letter provides:

> "Re: Sections 12—Maryland City
>
> Dear Mr. Borcherding:
>
> "The undersigned hereby guarantee to refund deposits made by contract purchasers of homes in Sections 9, 10 and 11 if the developer, Maryland City Corporation, fails to complete the dwellings and settle with the purchasers."

There is some conflict in the testimony in regard to whether there was an oral agreement or understanding that FHA would also issue conditional commitments for Sections 13 and 14. Harms testified:

> "It was agreed also that we would be given commitments contingent basically upon satisfactory operation in 12, that we would be given commitments in Sections 13 and 14, following right on through in the normal sequence as had been done in other sections of Maryland City, earlier sections."

He further testified that a financial analysis had been made and the appellants were aware of the making of the deposits by the contract purchasers. An analysis had also been made of the construction to be completed. He stated:

> "We compared that with the draws remaining to be drawn, and there was no possible way, no sensible, reasonable way, by which the development could even approach satisfactory financial completion without taking all three of these sections as one complete package."

When asked why FHA did not give commitments for Sections 13 and 14 at the same time as it gave them for Section 12, he stated:

> "I don't know the complete answer, but it was just a matter of policy, I presume. The practice had been

throughout the earlier portions of Maryland City to have one section achieve a fixed or approximate completion portion or percentage before the next section was given commitments."

In regard to alleged assurances given by Borcherding, his testimony was as follows:

"Q. Were you given any assurances as to 13 or 14 by Mr. Borcherding?

"A. Indeed so, as far as I was concerned, I was, yes.

"Q. What were those assurances?

"A. Only the fact that if we performed properly in Section 12, we would be given commitments on Sections 13 and 14. Otherwise we wouldn't have even started Section 12."

On cross examination, Harms stated that at the time he signed the letter of May 27, he did not expect FHA to issue commitments for Sections 13 and 14 as its policy was to issue commitments for one section at a time and that "When we showed sufficient progress on 12, we were to have gotten 13 and so on." As he understood it, "commitments were to be issued on one section, then work would reach a certain stage of progress and then perhaps commitments would be issued on the next section."

In regard to why he signed the letter of May 27, Harms testified:

"We were substantial creditors, one of my cohorts here was a substantial creditor, we had a lot of friends who were creditors, and I individually met with the subcontractors at Maryland City on at least one occasion and discussed with them the problems that were being encountered, the financial problems. A lot of the subcontractors were not being paid and things didn't seem to be going along properly, and it was agreed in this get-together that we had with the subcontractors that Mr. Miller, who had been with the project since it began and I, who had been with the project since it be-

gan, and Mr. Shillman, who was a substantial creditor of Maryland City, would, so to speak, represent the subcontractors, who all were in the process of being, taken broke and bankrupt and so on, we would represent them in a group to try to oversee this thing, and this is how we got involved with Maryland City, how we got to the stage of talking with Mr. Borcherding, and when we reached the point where we were obligated to sign this letter in order to keep Maryland City going, we felt that it was the right thing to do and this was our obligation, and we took a stab at it."

Miller testified that it would be impossible to operate the whole development unless a commitment were obtained for Sections 13 and 14 and this was discussed with Borcherding, who stated: "He said just get started. We have no problems." Miller further testified that if the commitment was only for Section 12, he would never have signed the letter of May 27.

Borcherding, on the other hand, testified that he never gave the appellants "any assurance that the FHA would issue conditional commitments as to Sections 13 or 14." He stated that Sections 13 and 14 "may have been discussed, but I am sure that my answer was, as it would be if I were still there, that let's get finished with Section 12 first before we even start to discuss 13 and 14, because we weren't interested in it."

Buttner, who was present at the May, 1964, meeting testified that FHA issued 90 conditional commitments for Section 12 but did not approve Sections 13 and 14 for conditional commitments. At the request of the developer, Weaver Bros., on August 31, 1964, wrote FHA for permission to submit applications on Sections 13 and 14, but he had little hope that there would be favorable consideration of the request by FHA "Because satisfactory progress in the other sections had not been made."

It is not disputed that it was agreed that the down payments made by contract purchasers in Section 12 would be held in escrow and these down payments are not involved in this litigation.

Later in 1964 the developer became insolvent. The appellants maintain that this was caused by the delay by FHA in issuing

conditional commitments for Sections 13 and 14. In any event a receiver was appointed for the developer and there was a default under the deed of trust to Weaver Bros. Foreclosure proceedings were instituted and at the foreclosure sale Weaver Bros. purchased all of the lots in Sections 11, 12 and 13. Many of the houses on the lots in these sections were in varying degrees of construction. These lots were resold by Weaver Bros. to certain of the appellees.

The appellees, as contract purchasers, could repurchase these houses and lots only if FHA insured mortgages were available for them. The FHA regulations provided for down payments equal to a certain percentage of the FHA valuation, and in order to avoid the effect of this regulation as applicable to the resale contract purchasers the value of each house was increased to the extent of the actual deposit theretofore given the developer, so that each former contract purchaser would qualify for what in effect would be a 100% FHA insured loan so far as Weaver Bros. was concerned. Those appellees who availed themselves of this arrangement were obliged to pay to Weaver Bros., for application to their respective mortgages, any amounts received by them from the appellants in the present case.

An action was filed by the appellees to recover as donee beneficiaries in January, 1965. After an amended declaration was filed, the appellants pleaded the general issue pleas, but no special pleas. There was a stipulation between the parties in regard to many facts not in dispute, including a stipulation that none of the original contract purchasers of lots in Sections 9, 10 and 11 have been refunded their deposits. After the taking of testimony, the lower court (Macgill, C. J.) sitting without a jury, in a well-reasoned and carefully considered written opinion, concluded that the appellees were intended to be donee beneficiaries under the guaranty of May 27, 1964, and entered judgment for the appellees in varying amounts from $203.25 to $2,455.00, a total of $48,718.25.

The appellants make four contentions:

1. The appellees are not donee beneficiaries of the agreement of May 27, 1964.

2. The agreement of May 27, 1964, is void for a lack of failure of consideration.

*3.* The promise to refund the deposits was conditional upon the granting by FHA of conditional commitments for Sections 12, 13 and 14.

*4.* The agreement of May 27, 1964, was void as ultra vires FHA, was obtained by economic duress and was against public policy.

We will consider these contentions in the order mentioned.

### 1.

In our opinion, the appellees were donee beneficiaries under the contract of May 27, 1964, and were entitled to sue and recover as such beneficiaries.

Since the establishment of the doctrine of third party beneficiaries in the landmark decision of the Court of Appeals of New York in *Lawrence v. Fox,* 20 N. Y. 268 (1859), substantially all state courts of last resort, including this Court, have adopted and applied the doctrine. *See Small v. Schaefer,* 24 Md. 143 (1866), adopting the doctrine for Maryland, and 4 *Corbin on Contracts* § 722. It is a developing doctrine of law and its limits in particular cases are still being established. See 4 *Corbin on Contracts* § 722.

Our predecessors considered the doctrine and its scope in *Mackubin v. Curtiss-Wright Corporation,* 190 Md. 52, 57 A. 2d 318 (1948), and again in *Marlboro Shirt Co. v. American District,* 196 Md. 565, 77 A. 2d 776 (1951), both involving alleged donee beneficiaries. In *Marlboro,* Judge Grason, for the Court, stated the applicable law to be as follows:

> "It has been stated by this court that at common law privity between the plaintiff and defendant is requisite to maintain an action on a contract, even though the contract is for the benefit of a third party. But that rule has gradually relaxed, so that now, in this State, a person for whose benefit a contract is made can maintain an action upon it. But before one can do so it must be shown that the contract was intended for his benefit; and, in order for a third party beneficiary to recover for a breach of contract it must clearly appear that the parties intended to recognize him as the primary party in interest and as privy to the promise.

An incidental beneficiary acquires by virtue of the promise no right against the promisor or the promisee. 'In order to recover it is essential that the beneficiary shall be the real promisee; i.e., that the promise shall be made to him in fact, though not in form. It is not enough that the contract may operate to his benefit. It must clearly appear that the parties intend to recognize him as the primary party in interest and as privy to the promise.' (Quoting authorities.) *Mackubin v. Curtiss-Wright Corp.*, 190 Md. 52, 57 A. 2d 318, 321." (196 Md. at 569, 77 A. 2d at 777).

Even more recently in *Hamilton & Spiegel, Inc. v. Board of Education of Montgomery County*, 233 Md. 196, 195 A. 2d 710 (1963), involving an alleged creditor beneficiary, Judge (now Chief Judge) Hammond, for the Court, aptly stated:

"In determining whether one is a creditor beneficiary (as is true in the case of a donee beneficiary) the intention of the contract, revealed by its terms, in the light of the surrounding circumstances is the controlling determinative." (233 Md. 199, 195 A. 2d 711.)

The *Restatement of Contracts,* § 133 defines a donee beneficiary as follows:

"(1) Where performance of a promise in a contract will benefit a person other than the promisee, that person is, except as stated in Subsection (3): (a) a donee beneficiary if it appears from the terms of the promise in view of the accompanying circumstances that the purpose of the promisee in obtaining the promise of all or part of the performance thereof is to make a gift to the beneficiary or to confer upon him a right against the promisor to some performance neither due nor supposed or asserted to be due from the promisee to the beneficiary; * * *."

In determining the intention of the parties, the language of the instrument is the primary source for that determination.

See *Hamilton & Spiegel, Inc. v. Board of Education of Montgomery County, supra.* The language of the contract of May 27, 1964, clearly identifies the class of persons to whom deposits would be refunded [1] and provides that the appellants would guarantee that refund. This is the primary and indeed the only purpose of the contract and, prima facie, these contract purchasers are donee beneficiaries. The surrounding circumstances confirm that this was the intention of the parties. Borcherding testified, without objection, that it was intended that the purchasers of homes in Sections 9, 10 and 11 were intended to be recognized as the primary parties in interest. This testimony, accepted by the trial court as correct, is entitled to substantial weight as representing the intention of the promisee. As Professor Corbin stated in 4 *Corbin on Contracts,* § 776:

> "The recognition of a right in a third person is often thought to depend upon the intention of the contracting parties, particularly that of the promisee who pays for the promise in question, to confer a benefit upon him. This has been variously expressed in scores of cases. But the ideas that lie behind such terms as 'purpose,' 'motive,' and 'intention' are obscure and elusive, as has been found in the criminal law as well as the civil. When a contract is made, the two or more contracting parties have separate purposes; each is stimulated by various motives, of some of which he may not be acutely conscious. The contract itself has no purpose, motive, or intent. The two parties have purposes, motives, and intentions; but they never have quite the same ones.
>
> "In third party cases, the right of such party does not depend upon the purpose, motive or intent of the promisor. The motivating cause of his making the promise is usually his desire for the consideration given by the promisee. In few cases will he be moved

---

1. Professor Corbin, in 4 Corbin on Contracts, § 781 states: "If a class of persons is clearly designated as beneficiaries, an individual of that class can maintain suit even though not specifically named." (Footnote omitted.)

by a desire to benefit a third person. If A buys Black-acre from B and promises B to pay the price to C, he makes this promise in order to get Blackacre, not to benefit C; and this is true whether C is a creditor of B's or is B's dearly beloved daughter or is a home for imbeciles. * * *

"How is it with the purposes and motives of the promisee? If B conveys Blackacre to A in return for A's promise to pay $1,000.00 to B's dearly beloved daughter C, it will usually be a desire to make C happy and comfortable that motivates B and causes him to convey his land to A. There is a purpose and intent to 'benefit' C by making her a gift of money. This 'intent to benefit' C is given weight by the courts and the prevailing law is that C has a right against A." (Footnotes omitted.)

In the present case, the promisee clearly indicated its intent that the contract purchasers should be the donee beneficiaries, while the promisor had possibly other motivations, such as the need to obtain FHA conditional commitments on Section 12 in order to keep the developer functioning and to benefit sub-contractors and possibly others. The face of the contract, how-ever, indicates that the primary and direct benefit was intended for the contract purchasers. It is, in our opinion, a clear—if not a classic—case of a donee beneficiary contract. In any event, we obviously could not hold that the lower court was clearly in error in so finding.

2.

It is entirely correct as the appellants state that a third party beneficiary takes subject to the same defenses against the en-forcement of the contract, as such, as exist between the original promisor and promisee. As stated by the *Restatement of Contracts*, § 140:

"There can be no donee beneficiary or creditor bene-ficiary unless a contract has been formed between a promisor and a promisee; and if a contract is condi-tional, voidable, or unenforceable at the time of its for-

mation, or subsequently ceases to be binding in whole or in part because of impossibility, illegality or the present or prospective failure of the promisee to perform a return promise which was the consideration for the promisor's promise, the right of a donee beneficiary or creditor beneficiary under the contract is subject to the same limitation."

The thrust of the argument of the appellants is that there was a want or failure of consideration for the contract of May 27, 1964, in that FHA was already under the legal obligation to grant conditional commitments for Sections 12, 13 and 14 relying upon 24 Code of Federal Regulations, Sections 200.140 et seq. setting forth the regulations in connection with the requirements of the loan, the property involved and the eligibility of the mortgagor. It is contended that when these requirements were satisfied, FHA was under a statutory duty to grant the commitments regardless of who might be the developer, or the developer's circumstances.

The provisions of 24 C.F.R. §§203.10-203.43, however, establish the necessary conditions precedent for the issuance of commitments. Section 203.28 provides:

"The mortgage must be executed with respect to a project which in the opinion of the Commissioner is economically sound, * * *."

This section is based upon the express provision of §203(c), 12 U.S.C. §1709(c), which provides:

"* * * but no mortgage shall be accepted for insurance under this section unless the Secretary finds that the project with respect to which the mortgage is executed is economically sound."

See also Section 203(a) of the National Housing Act, 12 U.S.C. §1709(a), which provides:

"The Secretary is authorized, upon application by the mortgagee, to insure as hereinafter provided any mortgage offered to him which is eligible for insurance as hereinafter provided, and, upon such terms as

the Commissioner may prescribe, to make commitments for the insuring of such mortgages prior to the date of their execution or disbursement thereon."

From these statutory provisions and the provisions of the applicable regulations, it is our opinion that there is discretion vested in the Secretary of Housing and Urban Development to determine the question of economic desirability of insuring and, in the absence of evidence of an abuse of that discretion, the Secretary's determination will not be set aside by the Courts. In short, there was no *existing statutory duty* on the part of FHA to issue the conditional commitments for Section 12 so that their promise to do this was sufficient consideration for the promise of the appellants to refund the down payments of the contract purchasers.

It is not clear that the point in regard to the want or failure of consideration was raised in the trial court, although such an issue may be raised under the general issue pleas. See Maryland Rule 342 b 3. If a point or question is not raised in the lower court and decided by it, we will not ordinarily decide it on appeal. Maryland Rule 885. In view of some uncertainty on this aspect of the matter, we have preferred to decide this issue on the merits.

### 3.

Here again it is not clear that the point that the promise of the appellants was conditioned upon the granting of FHA of conditional commitments on Sections 13 and 14 in addition to Section 12 was raised or decided below, although as we have indicated, testimony was taken in regard to the matter. The contract of May 27, 1964, which was prepared and signed by the appellants refers to Section 12 *only,* the testimony of Borcherding is clear and unequivocal to the effect that the granting of conditional commitments for Section 12 was the only thing provided by FHA, and, indeed, the testimony of Miller and Harms, on cross-examination, is not really inconsistent with the terms of the contract and Borcherding's testimony. In our opinion, this contention of the appellants is without merit.

### 4.

The contention of the appellants that the contract was ultra

vires FHA was not raised below in that Maryland Rule 342 c 1 (g) requires that this defense be specially pleaded in order to be considered. This defense was not specially pleaded, was not considered by the lower court and will not be decided by us. Maryland Rule 885, *supra*.

In our opinion, the contract of May 27, 1964, was not against public policy as allegedly having been obtained by *economic duress*. Economic duress or business compulsion, if otherwise available, is clearly not available as a defense by the appellants as there was no showing whatever that FHA caused the financial embarrassment or economic duress. *See Shriver v. Druid Realty Co.,* 149 Md. 385, 131 A. 815 (1926). Mere stress of business does not constitute duress, when the person against whom it is asserted was not responsible for such circumstances. *See Lawrence v. Muter Co.,* 171 F. 2d 380 (7th Cir. 1948) *cert. den.* 337 U. S. 907, 69 S. Ct. 1049, 93 L. Ed. 1720 (1949). *See also, French v. Shoemaker,* 81 U. S. (14 Wall.) 314 (1872) and *In re Prima Co. (Harris Trust & Savings Bank v. Keig),* 98 F. 2d 952, 965 (7th Cir. 1938) ; *Alloy Products Corp. v. United States,* 302 F. 2d 528 (Ct. Cl. 1962) ; *DuPuy v. United States,* 67 Ct. Cl. 348 (1929) ; *Grimshaw Co. v. Withrow Co.,* 248 F. 2d 896 (8th Cir. 1957), *cert. den.* 356 U. S. 912, 78 S. Ct. 669, 2 L. Ed. 2d 585 (1958) ; *United States v. Bell,* 259 F. Supp. 602 (N. D. Okla. 1966) ; and *Reconstruction Finance Corp. v. Commercial Union, et al.,* 123 F. Supp. 748 (S. D. N. Y. 1954).

In our opinion, the contract was not against public policy. On the contrary, it is entirely consistent with the declared purposes of the Housing Act of 1949, 42 U.S.C. 1441 and Sections 1713(b), 1715(e), 1715(k), 1715(m), 1715(v) and 1715(w) of 12 U.S.C. *See also Executive Order 11136,* 29 Fed. Reg. 129-30 (1964) establishing the President's Committee on Consumer Interests, a member of which is the Housing and Home Finance Administrator.

*Judgments affirmed, the costs to be paid by the appellants.*