487 A.2d 1252

The BALTIMORE CITY LODGE NO. 3 OF the
FRATERNAL ORDER OF POLICE, INC.

v.

Eva Marie MANTEGNA.

No. 677, Sept. Term, 1984.

Court of Special Appeals of Maryland.

Feb. 14, 1985.

Harvey S. Wasserman, Baltimore (Sidney Schlachman, Herbert R. Weiner and Steinberg, Schlachman, Potler, Belsky & Weiner, P.A., Baltimore, on brief), for appellant.

Harry Fox, Baltimore (Thomas Fancher, Baltimore, on brief), for appellee.

Argued before MOYLAN, ADKINS and BLOOM, JJ.

ADKINS, Judge.

Appellee, Eva Marie Mantegna (Mrs. Mantegna), sued appellant, The Baltimore City Lodge No. 3 of the Fraternal Order of Police, Inc. (FOP), in the Circuit Court for Baltimore City. She sought to recover counsel fees that she incurred in the course of obtaining a divorce from her former husband, Joseph Mantegna, an FOP member. She asserted her claim against FOP as a third-party beneficiary of a pre-paid legal plan established by FOP for its members. She recovered a judgment in the amount of $4,710.

On appeal from that judgment FOP asserts that

1. The ad damnum clause in Mrs. Mantegna's declaration was insufficient to invoke the jurisdiction of the Circuit Court for Baltimore City; and

2. The court erred in finding that Mrs. Mantegna was a third-party beneficiary of the pre-paid legal plan.

We reject both contentions and affirm.

### The Ad Damnum Clause

In 1980, when Mrs. Mantegna filed her action, the District Court of Maryland had exclusive original jurisdiction over any civil contract action in which the amount in controversy did not exceed $2,500. Courts and Judicial Proceedings Article §§ 4–401 and 4–402(d)(1) (1980 Repl.Vol.). When the amount in controversy exceeded $2,500 but was less than $5,000, the District Court and the circuit courts had concurrent jurisdiction.[1]

■ So far as damages were concerned, Mrs. Mantegna's declaration said:

13. That, as a result of the aforesaid breach of contract, Plaintiff has suffered damages in excess of Two-Thousand Five Hundred Dollars. . . .

WHEREFORE this suit is brought and Plaintiff claims damages in an amount to be proved at trial.

FOP's attempt to demonstrate that this language does not invoke the jurisdiction of the circuit court borders on the absurd. FOP seeks to accomplish this extraordinary leap of logic by conveniently disregarding the words "in excess of" and by focusing simply on the dollar amount stated. This will not wash. Mrs. Mantegna alleged she had suffered damages "in excess of" $2,500 and claimed "damages in amount to be proved at trial." Obviously, the sum claimed exceeded $2,500, even though the precise amount by which her damages exceeded that figure was to be established by evidence. Paragraph 13 of the declaration and the immediately-following "WHEREFORE" paragraph must be read together. When so read, they constitute an ad damnum clause sufficient to support circuit court jurisdiction.

FOP attempts to bolster or expand its jurisdictional argument by pointing out that in a civil action for damages a

---

1. That is still true today, except that the concurrent jurisdiction of the District Court is now $10,000. Courts and Judicial Proceedings Art. §§ 4–401 and 4–402(d)(1) (1984 Repl.Vol.).

declaration that asserts no monetary amount of damages whatsoever is demurrable as lacking a necessary jurisdictional fact. *Treusch v. Kamke,* 63 Md. 274, 276–77 (1885). We are also informed that a plaintiff may not recover damages in an amount greater than that claimed. *See* Md. Rule 1073(b). *See also Carl M. Freeman Associates, Inc. v. Murray,* 18 Md.App. 419, 420 n. 3, 306 A.2d 548 *cert. denied,* 269 Md. 756 (1973). Each of these propositions is a correct statement of law, but neither applies to this case. FOP did not test the adequacy of the ad damnum clause by demurring; it interposed general issue pleas. In any case, again reading paragraph 13 and the "WHEREFORE" paragraph together, it is plain that the declaration set forth a claim for damages expressed in terms of a monetary sum: an amount in excess of $2,500. Nor did Mrs. Mantegna's recovery of $4,710 exceed the amount she claimed. She did not seek damages of $2,500, but rather damages in excess of $2,500. This is what she obtained.

█ FOP's real complaint seems to be that the declaration was not sufficiently precise as to damages because it set no upper limit on the claim. Had Mrs. Mantegna employed the more usual mode of pleading and said (following paragraph 13 of the declaration) "WHEREFORE this suit is brought and Plaintiff claims damages of $50,000 and costs," all of FOP's objections would have been met, although it still would have been in the dark as to the precise sum involved.[2] But Maryland practice does not demand such precision in pleading, as our example of the customary ad damnum clause illustrates. Former Md.Rule 301 required a pleading to "contain only such statements of fact as may be necessary to constitute a cause of action" and deemed sufficient

---

2. For forms of *ad damnum* clauses under the rules of procedure in effect when this case was tried, *see* Form 5b, Appendix of Forms, 2 Maryland Rules of Procedure (1984) and 1 M. Sykes and N. Tabor, M.L.E. Procedural Forms (1964) § 482. For similar forms under current rules, *see* 1 E. Digges and R. Klein, *Maryland Civil Procedure Forms* (1984) Form 2–303.5, and 3 G. Liebman, *Maryland Procedure Forms* (1984) § 353.

a pleading that did this "without reference to mere form...." Former Rule 340 a, applicable to actions at law, required a declaration to comply with Rule 301 and to "contain a demand for judgment for the relief to which the plaintiff deems himself entitled." Errors or defects in pleadings that did not "affect the substantial rights of the parties" were to be disregarded. Former Rule 320 a.4. *Accord* present Md.Rules 2–303(b), 2–305, and 2–341(c). Mrs. Mantegna's declaration complied with the rules in effect when it was filed.[3] FOP could have addressed any legitimate concerns about the precise amount of damages claimed through the discovery process.

### *Mrs. Mantegna as Third-Party Beneficiary*

■ As we have noted, Mrs. Mantegna's suit against FOP was based on the theory that she was the third-party beneficiary of a contract between FOP and its members—a contract providing for pre-paid legal services. As to that theory, the record reveals the following:

In December, 1976, Mr. Mantegna was a Baltimore City police officer and an active member of FOP. In that month he received a communication from FOP. This communication outlined the many benefits FOP offered its members. It proposed the creation of an additional benefit: a pre-paid legal plan. So far as pertinent to this case, the communication advised that the plan would be available "to each member and his eligible dependents." It defined "eligible dependents" as "a spouse and/or children eighteen ... years of age and under." One of the services available under the plan was described as "[d]omestic problems—including divorce, legal separation, adoption of children, change of name." The communication also pointed out that to fund this plan (as well as other services) it would be necessary to increase FOP dues from $1.00 to $2.50 per pay period for each active member. Enclosed was a proposed

---

**3.** We do not intend to suggest that it would not comply with the present rules as well. That is an issue we need not reach.

resolution to amend the FOP by-laws by increasing the dues in that amount. The resolution recited, *inter alia,* that FOP "provides family law services to the membership and their eligible dependents."

Mrs. Mantegna and her then-husband discussed the communication and the resolution. According to her testimony, they decided the pre-paid legal plan would be beneficial. At an FOP membership meeting in early 1977, the resolution was adopted, with Mr. Mantegna voting in the affirmative.

Later in 1977, and again in 1978, FOP mailed brochures to its members. These brochures described the pre-paid legal plan. Each of these brochures stated that the plan extended to members and eligible beneficiaries, defined eligible beneficiaries to include spouses of members, and listed divorce as one of the covered services. The brochures stated that: "The pre-paid legal plan will pay 100% of the legal fees for the services provided to the member and eligible beneficiaries...." Exclusions from the plan were listed, but there was no exclusion for legal services as to which an FOP member and his or her spouse occupied adversarial positions.

In 1979 the Mantegnas began experiencing domestic difficulties. Mrs. Mantegna received a letter from a lawyer with the law firm servicing the pre-paid legal plan advising that he had been retained to represent Mr. Mantegna in the matter. Mrs. Mantegna sought representation from the same firm but was refused on grounds of conflict of interest. She then retained other counsel and later requested reimbursement from the plan for her lawyer's fees. This was refused. This suit followed.

In 1981 the Mantegnas were divorced. After that her suit against FOP came to trial. As we have seen, she recovered. The trial judge found that the 1976 communication (and in effect the 1977 and 1978 brochures) represented a contract between FOP and its members and that Mrs. Mantegna was a third-party donee beneficiary of that contract. Accordingly, he concluded that she was entitled to

reimbursement for the legal fees she had incurred in connection with the divorce proceedings.

In *Weems v. Nanticoke Homes, Inc.,* 37 Md.App. 544, 552, 378 A.2d 190 (1977), we quoted with approval *Restatement of Contracts* § 133 (1932) to the following effect:

(1) Where performance of a promise on a contract will benefit a person other than the promisee, that person is . . .

(a) a donee beneficiary if it appears from the terms of the promise in view of the accompanying circumstances that the purpose of the promisee in obtaining the promise of all or part of the performance thereof is to make a gift to the beneficiary or to confer upon him a right against the promisor to some performance neither due nor supposed or asserted to be due from the promisee to the beneficiary.

FOP does not quarrel with this definition or with the proposition that a donee beneficiary may recover against the promisor. Nor does FOP seriously question that the 1976 communication (and the 1977 and 1978 brochures) represented a contract between FOP and its members, the former being the promisor and the latter the promisees. There was ample evidence to support such a finding. FOP's complaint in essence is that the trial court considered only the language of the documents (which on their face clearly established Mrs. Mantegna as a donee beneficiary) and gave inadequate consideration to the "surrounding circumstances" which shed light on the true intention of the parties. This intention, says FOP, was that spouses of members were not to be covered by the plan in matters in which their interests were adverse to those of covered members; specifically, in a divorce proceeding involving a member and his or her spouse.

The "surrounding circumstances" upon which FOP relies chiefly involve what a lawyer from the law firm that was to service the plan told FOP's directors and its members prior to the adoption of the plan. The lawyer testified that there

was concern about the rights of spouses *vis a vis* covered members and that he explained "that it would be unethical for our firm to engage in that kind of [dual] representation." He told the members that the firm "contemplated representing the members only" and that "We would not be in conflict with our obligation to the dues-paying member." This is all very interesting, and no doubt ethically correct. But it does nothing to show an intention that the contract was not intended to provide fee reimbursement to members' spouses in accordance with its clear terms. It shows only that the servicing law firm did not in itself intend to provide services to a member and his or her adversary spouse.[4] That is consistent with a separate service agreement between the law firm (or a lawyer in that firm) and FOP. It is also perfectly consistent with the plan's provision for payment of "100% of the legal fees for the services provided to the member and eligible beneficiaries...."

It is true that Mr. Mantegna testified, in effect, that when he voted for the plan in early 1977 he thought it would not provide benefit for spouses involved in divorce litigation with members. This tells us little of what the other members intended when they voted for the plan. In any case, what Mr. Mantegna and the other members adopted was a resolution (unamended, so far as the record reveals) calling for the provision of "family law services to the membership and their eligible dependents." The scope of that plan, including the definition of the services and of eligible dependents, was made clear in the communication sent to all members with the resolution. Those definitions included a person in the circumstances in which Mrs. Mantegna later found herself. That was the plan adopted by the members.

In donee beneficiary cases as in other contract case, "[i]n determining the intention of the parties, the language of the

---

**4.** *See* DR 2–103(E)(3)(f) of the Code of Professional Responsibility; Md.Rule 1230, Appendix F. This provision appears to require alternative arrangements for coverage under a legal services plan when there is a conflict of interest such as the one in this case.

instrument is the primary source for that determination." *Shillman v. Hobstetter,* 249 Md. 678, 688, 241 A.2d 570 (1968). We conclude in this case, as the Court of Appeals did in *Shillman,* that the "language of the contract ... clearly identifies the class of persons" who were donee beneficiaries. 249 Md. at 689, 241 A.2d 570. Mrs. Mantegna was a member of that class by virtue of the plain words of the contract. We are not persuaded that the trial court was clearly erroneous in its findings to that effect.

JUDGMENT AFFIRMED.

APPELLANT TO PAY THE COSTS.