*CX Reinsurance Company Limited, et al. v. Devon Johnson, et al.*, No. 691, September Term 2020.  Opinion by Beachley, J.

**INTENDED THIRD-PARTY BENEFICIARIES—INSURANCE POLICIES— PUBLIC POLICY FOR INJURED TORT CLAIMANTS—RIGHTS VEST AT TIME OF INJURY**

Numerous plaintiffs, who were children in the 1990s and early 2000s, were allegedly exposed to lead paint while residing in homes owned by certain landlords.  These landlords had obtained insurance policies through commercial general liability policies with appellants CX Reinsurance Limited Company ("CX") and Liberty Mutual Mid-Atlantic Insurance Company ("Liberty Mutual"), ("Insurers").  The insurance policies required the Insurers to defend against and potentially indemnify the landlords for liability as to lead paint injuries sustained on their properties.

In 2015, CX filed contract rescission actions against the landlords in federal court, alleging that the landlords had made fraudulent misrepresentations in their insurance applications.  CX and the landlords eventually reached settlement agreements (the "Rescission Settlement Agreements") that either eliminated or greatly reduced the insurance coverage for lead paint injuries under the insurance policies.  The Rescission Settlement Agreements consequently modified the plaintiffs' abilities to recover damages from their landlords for their alleged lead paint injuries.

Thereafter, the plaintiffs filed a complaint in the Circuit Court for Baltimore City seeking a declaratory judgment against the Insurers that: 1) the plaintiffs were intended third-party beneficiaries of the insurance policies, 2) that they had vested rights in those insurance policies prior to the execution of the Rescission Settlement Agreements, and 3) that the Rescission Settlement Agreements did not impact those vested rights.

The circuit court granted the plaintiffs' request for declaratory judgment, and the Insurers appealed.

*Held*: Judgment affirmed.  Although there is no case in Maryland that explicitly holds that injured tort claimants such as the plaintiffs in this case constitute intended third-party beneficiaries of insurance policies, Maryland appellate courts have consistently asserted, albeit in *dicta*, that they are.  Accordingly, the plaintiffs here, who are injured tort claimants, are intended third-party beneficiaries of the insurance policies and therefore possess vested rights to enforce those policies.

By virtue of their status as intended third-party beneficiaries, the plaintiffs' rights to enforce the insurance policies vested at the time of their injuries.  Although there is no Maryland authority directly on point, the overwhelming weight of authority in other jurisdictions and secondary sources indicates that an intended third-party beneficiary's

right to enforce an insurance policy vests at the time of injury, and may not be subsequently modified by the insurer and the insured.  Accordingly, the plaintiffs' rights to enforce the insurance policies vested when they suffered their injuries at the landlords' properties, and the Rescission Settlement Agreements were ineffective in modifying those vested rights.

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 691

September Term, 2020

---

CX REINSURANCE COMPANY LIMITED, ET AL.

v.

DEVON JOHNSON, ET AL.

---

Beachley,
Ripken,
Moylan, Charles E., Jr.
    (Senior Judge, Specially Assigned),

JJ.

---

Opinion by Beachley, J.

---

Filed:  September 7, 2021

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

In this case, we are asked to determine whether the Circuit Court for Baltimore City erred when it granted, pursuant to a motion for summary judgment, a declaratory judgment in favor of appellees and against appellants. Appellants consist of insurance companies CX Reinsurance Limited Company ("CX") and Liberty Mutual Mid-Atlantic Insurance Company, formerly Merchants and Business Men's Mutual Insurance Company ("Liberty Mutual") (collectively, the "Insurers") that provided liability coverage to certain landlords through insurance policies (the "Policies"). Appellees consist of a group of tort claimants ("Plaintiffs") who either have proven in court or allege to be the victims of lead poisoning while living at properties owned by the landlords in the 1990s and 2000s when the landlords were insured by the Insurers' Policies.[1]

In 2015, CX filed contract rescission actions against the landlords, alleging that the landlords made fraudulent misrepresentations in their insurance applications. Ultimately, CX reached settlement agreements (the "Rescission Settlement Agreements") with the landlords that either eliminated or greatly reduced the insurance coverage that would be available to compensate Plaintiffs for their alleged lead injuries. Subsequently, the Plaintiffs filed a complaint for declaratory judgment against the Insurers, seeking a

---

[1] Appellees Lea Gardner, Devon Johnson, Chauncey Liles, Jr., and Shyliyah Streeter have already obtained judgments against their respective landlords in their underlying tort actions. Appellees Nakia Allen, Shakeia Allen, Katiara Harper, Shalita Harris, Tyrone Height, Ashley Mackey, Dale Mackey, Jr., Kayla Shy'Kira McKnight, Kahlil Tyler, Raegina Vincent, and Aaliyah Williams have filed tort actions against their respective landlords, but the matters have not been tried to verdict. As we shall explain below, the parties dispute whether appellees were required to secure judgments against their respective landlords before filing their complaints for declaratory judgment against the Insurers.

declaration that they are third-party beneficiaries of the Policies with vested rights to enforce those Polices, and that the Rescission Settlement Agreements do not affect those rights.

After a hearing on July 29, 2020, where the court considered the parties' competing motions for summary judgment, the circuit court granted Plaintiffs' request for a declaratory judgment. The court declared:

> 1) that Plaintiffs are third-party beneficiaries of the Policies; 2) that Plaintiffs have vested rights in the Policies as they existed before being rescinded by agreement or modified pursuant to the Rescission Settlement Agreements between [CX] and the Landlord Defendants; and 3) that the Rescission Settlement Agreements do not affect Plaintiffs' vested rights in the Policies, and the Rescission Settlement Agreements are ineffective as to Plaintiffs[.]

The Insurers timely appealed and present the following issues for our review, which we have consolidated and rephrased as follows:

1. Did the circuit court err in concluding that Plaintiffs are intended third-party beneficiaries of the Policies?

2. Did the circuit court err in concluding that Plaintiffs' rights in the Policies vested prior to the execution of the Rescission Settlement Agreements, and that the Rescission Settlement Agreements were ineffective as to Plaintiffs' vested rights?

We hold that the Plaintiffs are intended third-party beneficiaries of the Policies, that their rights to enforce the Policies vested when they suffered their injuries, and that the Rescission Settlement Agreements did not modify or affect those vested rights. Accordingly, we shall affirm.

**FACTS AND PROCEEDINGS**

In 1997, certain landlords applied for commercial general liability coverage with

2

CX for their rental properties in Baltimore. As part of the applications, landlords were required to indicate if "the [landlord] ever had any lead paint violations in the building(s)?" Apparently, every landlord answered this question in the negative.[2] CX then proceeded to issue these landlords general liability policies which, relevant here, provided coverage for bodily injuries resulting from lead paint exposure at the specified properties.[3] The Policies also contained a "changes" provision which stated that CX and the first named insured could amend or waive the terms of the Policy at any time and without obtaining any other insured's consent, as well as a "cancellation" provision, which stated that the first named insured could cancel the Policy. Thereafter, CX renewed the landlords' coverage, and starting in 1999, CX issued subsequent renewal policies through what would later become Liberty Mutual. All Plaintiffs resided in properties covered by these Policies during the late 1990s or early 2000s, and have alleged that they suffered lead exposure during their respective tenancies.

According to the Plaintiffs, a significant event relevant to this litigation occurred in 2011. Specifically, "the Court of Appeals invalidated Maryland's $17,000 liability cap on lead-related personal injury actions" in *Jackson v. Dackman Co.*, 422 Md. 357, 381-83 (2011). There, the Court of Appeals held that the $17,000 statutory cap then in place

---

[2] Landlord Singer Realty, Inc. did not answer this question in its Supplemental Application, but according to CX, Singer Realty, through its retail insurance broker, indicated that it had never had any lead paint violations in its buildings.

[3] All of the relevant policies are "occurrence" policies, *i.e.*, the policies cover events that occur during the applicable policy term.

violated the Maryland Declaration of Rights, stating, "For a child who is found to be permanently brain damaged from ingesting lead paint, proximately caused by the landlord's negligence, the maximum amount of compensation under a qualified offer is miniscule. It is almost no compensation." *Id*. at 382. The Court held that the cap's significant limitation on the amount of possible recovery violated Article 19 of the Maryland Declaration of Rights. *Id*. at 383. Plaintiffs allege that this shift in the law created a significant problem for the Insurers in light of the "countless pending lead paint claims against its insureds." Simply put, *Jackson* dramatically increased the Insurers' potential liability to injured tort claimants who successfully sued the insured landlords for lead poisoning. Plaintiffs claim that, in light of this shift in the law, CX "devised a sinister strategy to avoid its financial obligations at the expense of [Plaintiffs] and other lead paint victims."[4]

That strategy, according to Plaintiffs, was to procure the Rescission Settlement Agreements at issue in this case. Those settlement agreements came about as follows. In 2015, CX sued the landlords in the United States District Court for the District of Maryland, seeking rescission of the Policies on the grounds that the landlords had made fraudulent misrepresentations in the insurance applications. Specifically, CX alleged that the landlords lied regarding whether there had ever been any lead paint violations in the buildings to be insured. Ultimately, CX and the landlords entered into the Rescission

---

[4] Nothing in this opinion should be construed as giving credence to Plaintiffs' characterization of the Insurers' actions in this case. Indeed, those characterizations are wholly irrelevant to our resolution of the issues on appeal.

Settlement Agreements, which resulted in either mutual rescissions of the Policies or amendatory endorsements that reduced, but did not completely eliminate, the insurance coverage afforded by the Policies. Thus, CX's federal action against the landlords was not tried to judgment. The Plaintiffs were not parties to the Rescission Settlement Agreements.

In April 2018, a single Plaintiff who held a judgment against a landlord initiated the instant action by filing a complaint for declaratory judgment against CX and the appropriate landlord. By June 2019, the litigation had grown to add numerous Plaintiffs and landlord defendants, as well as Liberty Mutual. The Plaintiffs' Third Amended Complaint for Declaratory Judgment stated that the Plaintiffs were former residents of properties owned by the landlord defendants and insured by the Insurers. The Plaintiffs alleged that they had been injured by lead paint at these properties, and that the Insurers were responsible for defending and indemnifying the landlords for these lead paint claims. Recognizing the existence of the Rescission Settlement Agreements between the Insurers and the landlords, the Plaintiffs sought a declaration that they were intended third-party beneficiaries of the insurance Policies, and, concomitantly, that the Rescission Settlement Agreements had no legal effect on their vested rights to enforce the Policies.

Following a motion and cross-motion for summary judgment, the circuit court issued a memorandum opinion and corresponding declaration. As noted above, the court declared that: 1) the Plaintiffs are intended third-party beneficiaries of the Policies, 2) Plaintiffs' rights in the Policies vested before the Insurers and landlords executed the Rescission Settlement Agreements, and 3) the Rescission Settlement Agreements did not

5

affect the Plaintiffs' vested rights in the Policies and are ineffective as to the Plaintiffs. We shall provide additional facts as necessary.

## DISCUSSION

The parties agree on the applicable standard of review where the circuit court grants summary judgment:

> We review the Circuit Court's grant of summary judgment as a matter of law. *Goodwich v. Sinai Hosp. of Balt., Inc.*, 343 Md. 185, 204, 680 A.2d 1067, 1076 (1996) ("The standard of review for a grant of summary judgment is whether the trial court was legally correct." (citation omitted)). Before determining whether the Circuit Court was legally correct in entering judgment as a matter of law in favor of [appellees], we independently review the record to determine whether there were any genuine disputes of material fact. *Hill v. Cross Country Settlements, LLC*, 402 Md. 281, 294, 936 A.2d 343, 351 (2007). A genuine dispute of material fact exists when there is evidence "upon which the jury could reasonably find for the plaintiff." *Beatty v. Trailmaster Prods., Inc.*, 330 Md. 726, 739, 625 A.2d 1005, 1011 (1993) (citation omitted). "We review the record in the light most favorable to the nonmoving party and construe any reasonable inferences that may be drawn from the facts against the moving party." *Myers v. Kayhoe*, 391 Md. 188, 203, 892 A.2d 520, 529 (2006) (citation omitted).

*Windesheim v. Larocca*, 443 Md. 312, 326 (2015). In their reply brief, the Insurers allege that there are disputed facts in this case, such as whether the Insurers' federal rescission claims against the landlords were "meritless," and whether the Insurers "colluded with their insureds to defeat coverage." In its memorandum opinion, the circuit court noted that these matters were immaterial, and we agree. *See* footnote 3, *supra*. Although these facts are "in dispute," they are not material to the outcome of this declaratory judgment action because whether the Rescission Settlement Agreements were collusive or not is irrelevant to the vesting of the Plaintiffs' rights. Accordingly, our review is simply *de novo*.

6

Against this backdrop, we turn to the issues presented. As we shall explain, the Plaintiffs constitute intended third-party beneficiaries of the Policies. As intended third-party beneficiaries, the Plaintiffs are entitled to enforce the Policies. Additionally, the Plaintiffs' rights to enforce the Policies vested upon injury during their tenancies at the insured landlords' properties, and the Insurers and landlords, as the contracting parties to the Policies, could not subsequently modify those vested rights pursuant to the Rescission Settlement Agreements.

I.  PLAINTIFFS ARE INTENDED THIRD-PARTY BENEFICIARIES

The first issue we must resolve is whether the Plaintiffs are "intended" or merely "incidental" third-party beneficiaries of the Policies. The Insurers argue that the Plaintiffs are, at most, only "incidental" third-party beneficiaries, while the Plaintiffs contend that they are "intended" third-party beneficiaries.

The parties agree that in Maryland, "insurance policies are treated like other contracts." *Mesmer v. Md. Auto. Ins. Fund*, 353 Md. 241, 252 (1999). Accordingly, "Except as modified by statutes or regulations, the legal principles applicable to contracts generally are also applicable to insurance policies." *Id.* (citing *Kendall v. Nationwide Ins. Co.*, 348 Md. 157, 165-66 (1997)). Whether the Plaintiffs constitute "intended" or "incidental" third-party beneficiaries is important because intended third-party beneficiaries are permitted "to bring suit in order to enforce the terms of a contract." *120 W. Fayette St., LLLP v. Mayor of Balt.*, 426 Md. 14, 35-36 (2012) (citing *Dickerson v. Longoria*, 414 Md. 419, 452 (2010)). Incidental third-party beneficiaries, however, possess

7

no such rights.  *Id.* at 36 (citing *Lovell Land, Inc. v. State Highway Admin.*, 408 Md. 242, 261 (2009)).  In *120 W. Fayette St., LLLP*, the Court of Appeals explained:

> "An individual is a third-party beneficiary to a contract if 'the contract was intended for his [or her] benefit' and 'it . . . clearly appear[s] that the parties intended to recognize him [or her] as the primary party in interest and as privy to the promise.'"  [*Dickerson v. Longoria*, 414 Md. 419, 452 (2010) (alteration in original) (quoting *Shillman v. Hobstetter*, 249 Md. 678, 687 (1968))].  It is not enough that the contract merely operates to an individual's benefit: "An incidental beneficiary acquires by virtue of the promise no right against the promisor or the promisee."  *Lovell Land, Inc. v. State Highway Admin.*, 408 Md. 242, 261, 969 A.2d 284, 295 (2009) (citation omitted).

426 Md. at 36.

In *120 W. Fayette St., LLLP*, the Court of Appeals was tasked with determining whether a property owner constituted an intended third-party beneficiary.  There, the Baltimore City Council enacted an urban renewal plan in order to renew a five-block area in West Baltimore.  *Id.* at 16.  As part of the renewal plan, The Mayor and City Council of Baltimore (the "City") and the Maryland Historical Trust (the "Trust") entered into a Memorandum of Agreement (the "MOA") regarding the treatment of historic properties.  *Id.* at 17.  Essentially, the MOA required the City to submit its redevelopment plans to the Trust for review and approval.  *Id.*  "The Trust's Director and the State Historic Preservation Officer, J. Rodney Little, rejected the first four sets of redevelopment plans submitted by the City."  *Id.*  Mr. Little did, however, provide conditional approval of the City's fifth set of plans.  *Id.*  Shortly thereafter, 120 West Fayette filed a complaint seeking a declaration of rights pursuant to the MOA, requesting a declaration that Mr. Little's conditional approval was "*ultra vires*, *ab initio*."  *Id.*  The circuit court dismissed 120 West

8

Fayette's complaint on the grounds that it was neither a party to, nor an intended beneficiary of, the MOA. *Id.*

In affirming the circuit court, the Court of Appeals explained that, as part of the renewal plan, the General Assembly appropriated $11.5 million dollars to rebuild a performing arts center, but that appropriation "came with the condition that $1 million of the expenditure hinged" on the City and the Trust reaching an agreement concerning how to minimize the demolition of significant historic structures. *Id.* at 18. When Mr. Little granted approval of the City's development plan, he implied that he had only done so because of the "non-negotiable business model for redevelopment" of the plan. *Id.* at 21-22. 120 West Fayette suggested that Mr. Little only approved the plan due to "intense political pressure." *Id.* at 21 n.7. Once the Trust learned of Mr. Little's conditional approval, it took a vote and asked him to rescind, which Mr. Little declined to do. *Id.* at 22. Although the Trust contacted the Office of the Attorney General "for advice on the legal viability of challenging Mr. Little's approval[,]" ultimately, "the Trust took no further action, legal or otherwise, to challenge Mr. Little's conditional approval." *Id.* Thus, 120 West Fayette was the only party challenging Mr. Little's decision that he made on behalf of the Trust.

The Court of Appeals rejected 120 West Fayette's arguments that it had standing to bring the action pursuant to its status as a taxpayer or as an adjoining property owner. *Id.* at 25-35. "120 West Fayette therefore [was] left only with principles of contract law to establish its entitlement to press a claim for declaratory relief." *Id.* at 35. The Court of Appeals had no difficulty concluding that 120 West Fayette was, at most, an incidental

9

third-party beneficiary who lacked standing. *Id*. at 37. After noting that 120 West Fayette was not a party to the MOA entered into by the City and the Trust, the Court stated that "The promises and benefits set forth in the MOA are directed solely to the City and the Trust. Nowhere in the MOA is it contemplated that 120 West Fayette is to receive a benefit." *Id*. at 36. The Court further noted that 120 West Fayette was not a donee or creditor beneficiary of the MOA, nor was it claiming a direct right to compensation from the MOA.[5] *Id*. In light of these facts, the Court concluded that 120 West Fayette was, "at best an incidental beneficiary to the MOA" and was precluded from filing a suit "requesting declaratory judgment that interprets and enforces an agreement to which it has no part." *Id*. at 37.

In *CR-RSC Tower I, LLC v. RSC Tower I, LLC*, the Court of Appeals further elaborated on the line of demarcation between an intended and incidental beneficiary. 429 Md. 387 (2012). There, two developers entered into separate ground leases with landlords to develop adjoining properties. *Id*. at 398. As the developers sought financing for their projects, the landlords informed them that they were not in compliance with the terms of the leases. *Id*. at 400. Because of the time it took for the developers and landlords to determine whether the developers were in compliance with the terms of the leases, the developers were ultimately unable to secure financing, and the projects stalled. *Id*. at 401-02. When the building permits expired, the developers chose to sue the landlords for

---

[5] We will more fully explore the "donee" and "creditor" beneficiary statuses in Part II of our opinion.

10

damages rather than attempt to move forward with the projects. *Id*. at 402. "The verdict was large. The jury awarded damages of $36,350,239 against [the landlords], jointly and severally[.]" *Id*. at 403.

On appeal, the landlords argued that the damages should not have been awarded jointly and severally because the jury had erred in construing each of the developers as an intended third-party beneficiary of the other's lease. *Id*. at 455. The developers disagreed, asserting that their plans to create two "'intertwined,' mutually-dependent towers—under which '[n]either ground lease would have been executed had the other not been executed simultaneously'—'amply supported the jury's conclusion that each [developer] was a third party beneficiary of the other's ground lease.'" *Id*. at 456.

The Court of Appeals began its analysis by noting the distinction between "intended third-party beneficiaries" and "incidental third-party beneficiaries":

> In *Lovell Land, Inc. v. State Highway Admin.*, we explained the third-party beneficiary standard in more detail. We said the "decisive[ ] distinction" was between "intended and incidental beneficiaries," with the "crucial fact" being whether the pertinent provisions in the contract were "inserted . . . to benefit" the third party. 408 Md. 242, 261, 265, 969 A.2d 284, 296, 298 (2009). Another "factor to consider," we said, is whether the third party is named in the contract or its "antecedent agreements." *Id*. at 265, 969 A.2d at 297-98.

*CR-RSC Tower I, LLC*, 429 Md. at 457. The Court also noted its agreement with Section 302 of the Restatement (Second) of Contracts (1981), which provides:

> (1) Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either

11

(a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or

(b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.

(2) An incidental beneficiary is a beneficiary who is not an intended beneficiary.

The Court further explained that, "In applying this standard, we look to 'the intention of the parties to recognize a person or class as a primary party in interest as expressed in the language of the instrument and consideration of the surrounding circumstances as reflecting upon the parties' intention[.]'" *Id.* at 458 (quoting *Ferguson v. Cramer*, 349 Md. 760, 767 (1998)).

Against this backdrop, the Court summarized the only two cases cited by the developers:

> In *Shillman v. Hobstetter*, a residential developer and a lender agreed that the lender would issue conditional commitments for certain planned homes if the developer would refund certain purchasers' deposits. 249 Md. at 682–83, 241 A.2d at 572–73. The only thing the developer promised to do under the agreement (return the deposits) was clearly intended to benefit the purchasers, so logically we found that the purchasers were intended third-party beneficiaries. *Id.* at 690, 241 A.2d at 576–77. Similarly, in *Prescott v. Coppage*, the trial court appointed a receiver for a savings and loan company as well as a special counsel to assist him. Because the purpose of the court order was to benefit the creditors, we found them to be third-party beneficiaries entitled to recover against the special counsel. 266 Md. 562, 574, 296 A.2d 150, 156 (1972). In both cases, the contracts were created specifically to benefit the third parties in question. In other words, it is fair to say that the purchasers in *Shillman* and the creditors in *Prescott* were the "primary part[ies] in interest" under those contracts, because the provisions that named them were obviously "inserted . . . to benefit" them.

*CR-RSC Tower I, LLC*, 429 Md. at 459 (footnotes omitted).

Unlike the contracts in *Shillman* and *Prescott*, the Court held that the ground leases

12

in *CR-RSC Tower I, LLC* "were clearly entered into first and foremost for the benefit of the parties that signed them." *Id*. The Court noted that, "In each ground lease, the purported third-party beneficiary is mentioned only briefly and in passing—to wit, in sections involving easements running between the two parcels, plans for the development of common areas, and overall site plans that mention both towers." *Id*. Noting that the contractual provisions in *Shillman* and *Prescott* demonstrated that the third parties were "owed . . . a duty under the contract[s]," the Court held that this "crucial fact" was not present in the *CR-RSC Tower I, LLC* contracts. *Id*. at 459-60. Accordingly, the Court held that neither developer could claim intended third-party beneficiary status. *Id*. at 461-62.

Although *120 W. Fayette St., LLLP* and *CR-RSC Tower I, LLC* are instructive in understanding the basic legal principles governing intended and incidental third-party beneficiary relationships, neither case specifically addresses the unique context present here—whether liability insurance policies are issued for the benefit of parties that are injured by an insured's negligence. Although no Maryland appellate court has unequivocally held that a party injured by an insured is, as a matter of law, an intended third-party beneficiary of a liability insurance policy, both the Court of Appeals and this Court have suggested that they should be.

In *Jones v. Hyatt Ins. Agency, Inc*., 356 Md. 639, 641-42 (1999), the Court of Appeals had to determine whether the statute of limitations for the plaintiffs' breach of contract claim began to run at the time they discovered the breach or from the time they obtained a tort judgment against the insured. There, "a motor vehicle driven by Mr. Jones was struck by a motor vehicle driven by Robert Smith, an employee of K & D Auto, Inc."

13

*Id*. at 642. Twenty days prior to the accident, K & D had arranged with Hyatt Insurance Agency to obtain liability insurance. *Id*. Based on conversations with a life insurance agent who had business relationships with both Hyatt and K & D, "K & D believed that Hyatt had secured motor vehicle liability insurance" prior to the accident. *Id*. When K & D notified Hyatt of Mr. Jones's claim, however, K & D learned that it had not actually obtained vehicle liability insurance. *Id*.

Mr. Jones and his wife filed suit against K & D as well as its employee, Robert Smith. *Id*. at 643. "The Joneses obtained a default judgment against Smith, and K & D stipulated to its liability for Smith's accident on the ground of respondeat superior." *Id*. Following a nonjury trial on damages, the court entered two judgments, each for $450,000—one in favor of Mr. Jones for his personal injuries and the other in favor of Mr. and Mrs. Jones for loss of consortium. *Id*. K & D thereafter "assigned to the Joneses its claim against Hyatt for failing to procure motor vehicle liability insurance in the insurance package K & D had requested from the agency." *Id*.

Shortly after the judgments and assignment, K & D and the Joneses as assignees filed suit against Hyatt claiming both breach of contract and negligence in failing to procure the motor vehicle insurance K & D had requested. *Id*. at 643-44. The court dismissed these claims on limitations grounds, however, finding that K & D was aware of Hyatt's breaches and negligence more than three years before it filed suit. *Id*. at 644. The court imputed the same limitations onto the Joneses as K & D's assignees. *Id*. The court did assert, however, that, had the Joneses pursued a "direct action" against Hyatt rather than rely on the assignment, the statute of limitations would not commence until after the

14

Joneses secured their judgment against K & D in the underlying tort suit. *Id*.

Relying on the court's suggestion, the Joneses filed an amended complaint. *Id*. This time, the Joneses brought a direct action against Hyatt, arguing that they were third-party beneficiaries of the agreement between K & D and Hyatt to obtain motor vehicle liability insurance. *Id*. Hyatt moved to dismiss the amended complaint, arguing that the Joneses had no direct causes of action against Hyatt, but that, if they did, those actions were barred by limitations. *Id*. at 644-45. The circuit court disagreed, holding that the Joneses' rights, either as third-party beneficiaries or otherwise, accrued after they obtained the judgments against K & D. *Id*. at 645. When the Joneses prevailed on their actions in the circuit court, Hyatt appealed to this Court. *Id*. at 645-46. Notably, we "assumed, without deciding, that the Joneses, as third-party beneficiaries, did at one time have a viable contractual cause of action against Hyatt," but we ultimately concluded that the claims were barred by limitations. *Id*. at 646.

On petition for writ of certiorari, the Court of Appeals began its analysis by stating:

> We shall assume, *arguendo*, that the Joneses had a viable cause of action in contract as third-party beneficiaries of the agreement between Hyatt and K & D for Hyatt to procure motor vehicle liability insurance. We have recognized a similar third-party beneficiary cause of action in contract when a tort claimant sues the tortfeasor's liability insurer for a declaratory judgment concerning coverage or for breach of the contractual duty to indemnify.

*Id*. at 646-47 (citing *Mesmer*, 353 Md. at 267). In a footnote, the Court noted

> Under the same public policy and contract law analyses underlying the third-party beneficiary cause of action against the insurer, some jurisdictions have recognized a third-party beneficiary cause of action against an agent for breach of the contract to procure liability insurance. *See, e.g., Gothberg v. Nemerovski*, 58 Ill. App. 2d 372, 385-386, 208 N.E.2d 12, 20

15

(1965) ("Because of the peculiar significance of automobile liability insurance as well as the provisions of the policy contemplated by the parties . . . ," the "plaintiffs can be considered third party beneficiaries of the contract to procure insurance entered into between [the tortfeasor and the agent], that is, they had a sufficient interest in such a contract to bring suit directly for its breach. In entering into this contract to procure insurance, it is a fair and reasonable inference that [the tortfeasor was] contemplating possible injury to unidentified third parties, and the insurance coverage was for the direct benefit of third parties who might be injured through [his] negligence")[.]

*Id*. at 647 n.4.

Although the context in *Jones* concerned the procurement of motor vehicle insurance, the Court specifically cited *Harford Mut. Ins. Co. v. Woodfin Equities Corp.*, 344 Md. 399 (1997), a case *not* involving motor vehicle insurance, in support of the proposition that injured parties are intended beneficiaries of liability insurance policies. *Jones*, 356 Md. at 647. Ultimately, the Court held that the Joneses' claims were barred by limitations, applying the principle that a third-party beneficiary is subject to the same defenses that exist between the original promisor and promisee. *Id*. at 647-48.

Consistent with *Jones*, this Court has similarly suggested that injured tort claimants are intended third-party beneficiaries of insurance policies. In *Phillips v. Allstate Indem. Co.*, Phillips purchased a motorcycle and then obtained an insurance policy from Allstate Indemnity Company that provided protection against loss of the motorcycle. 156 Md. App. 729, 733 (2004). Shortly thereafter, "the motorcycle allegedly was stolen from a parking space in front of Phillips' apartment." *Id*. Phillips notified Allstate of the theft, and provided a recorded statement. *Id*. When Allstate sought to verify the information Phillips provided, it learned that he had lied about his employment. *Id*. at 733-34. Allstate then requested that Phillips complete an "Affidavit of Automobile Total Theft" form, but

16

because of inconsistencies in the information provided, Allstate requested that Phillips submit to an "examination under oath." *Id*. at 734. When Phillips declined, Allstate denied his claim for lack of cooperation. *Id*. at 736. In response to this denial, Phillips filed a breach of contract action against Allstate, later amending his complaint to include a declaratory judgment count. *Id*. Allstate moved for summary judgment, and, following a hearing, the circuit court, without explanation, granted Allstate's motion. *Id*. at 736-37.

One of the issues on appeal was "whether an insured's failure to answer questions is a failure to cooperate when a policy does not contain an express cooperation clause." *Id*. at 743 (footnote omitted). In resolving that issue, the Court discussed Md. Code (1995, 2017 Repl. Vol.), § 19-110 of the Insurance Article ("Ins."), which concerns whether an insurer may disclaim coverage on a liability policy where the insured has breached the policy by failing to cooperate. With regard to that statute, we stated:

> By its plain language, Ins. § 19-110 applies to a "liability insurance policy." *A liability insurance policy is "generally issued for the benefit of third parties who are injured and have a claim against a tortfeasor."* 7 Couch on Insurance § 104:8 (3d ed. 2003). Indeed, in the Maryland cases that address Ins. § 19-110, the issue has been whether an insurer could disclaim coverage and not pay benefits to a third party when the insured either failed to cooperate or to give timely notice.

*Id*. at 746 (emphasis added).

Although the emphasized portion of the Court's opinion is clearly *dicta*, we have recently endorsed this principle. *See Dolan v. Kemper Indep. Ins. Co*., 237 Md. App. 610, 620 n.5 (2018) ("A liability insurance policy, however, is a policy issued to protect an insured against the claims of injured third parties." (citing *Phillips*, 156 Md. App. at 746)); *see also Prudential Secs. Inc. v. E-Net, Inc*., 140 Md. App. 194, 215 (2001) ("Nevertheless,

17

there are situations in which an injured third party may come to be identified as a general class of persons sought to be among the intended beneficiaries of a contract. For example, a tort claimant has been recognized as a third-party beneficiary of a contract of insurance." (citing *Jones*, 356 Md. at 658)). Furthermore, this language comports with the Court of Appeals's assertion in *Jones* that injured tort claimants are intended third-party beneficiaries of insurance policies. *See also Travelers Ins. Co. v. Godsey*, 260 Md. 669, 674 (1971) ("As the third party beneficiary of the insurance contract, the claimant stands in the shoes of the insured wrongdoer and vis-à-vis the insurer his rights are no greater than those of the insured's." (citing *Shillman*, 249 Md. at 690)).

In summary, our review of the law demonstrates that Maryland appellate courts have recognized that injured tort claimants are intended third-party beneficiaries of liability policies. Although we acknowledge a split of authority on this issue in American jurisprudence, we adopt what we believe is not only the better view, but the view that has also been tacitly approved in Maryland appellate cases.[6] We therefore hold that injured

---

[6] At oral argument, the parties agreed that there is a split of authority regarding whether injured tort claimants are intended third-party beneficiaries of liability policies. Our research vindicates their assertion. Indeed, Appleman on Insurance has noted:

> Thus, it has been popular to say, in recent cases, that liability policies are carried for the benefit of the public in general, and that persons who are injured are third party beneficiaries. That is an accurate statement, in some respects; if they were not third party beneficiaries, they would have no rights under the contract. However, as seen by the overwhelming weight of authority those rights arise from, and are no greater than, the rights of the contracting party from whom they are derived. Some courts, tired of all the intricacies of reasoning, have stated flatly that injured persons are not third

(continued . . .)

18

tort claimants are intended third-party beneficiaries of liability insurance policies.[7]  Finally

party beneficiaries.  Other decisions more properly state that, even if they are such beneficiaries, their rights still are limited by the contract.

8 J.A. Appleman & J. Appleman, *Insurance Law and Practice* § 4811 at 346-48 (1981) (footnotes omitted).

For cases stating that insurance liability policies are issued for the benefit of the general public, *see, e.g., Reliance Ins. Co. v. St. Paul Ins. Cos.*, 239 N.W.2d 922, 925 (Minn. 1976) (noting that a lawyer's professional liability insurance "is not only a contract between the insurer and the insured but also a contract for the benefit of the public"); *Odolecki v. Hartford Accident & Indem.* Co., 264 A.2d 38, 42 (N.J. 1970) (stating that, in the context of automobile insurance, "a liability insurance contract is for the benefit of the public as well as for the benefit of the named or additional insured."); *Gov't Emps. Ins. Co. v. Dennis*, 232 N.E.2d 750, 752 (Ill. App. Ct. 1967) ("We agree that automobile public liability insurance assumes an importance to the general public beyond that normally found in private contracts.  Because the general public could be subjected to possible injury through the operation of the car in question, its members may be treated as third-party beneficiaries.").

For cases rejecting the notion that insurance liability policies are issued for the benefit of the general public, *see, e.g.*, *Molina v. Am. Alt. Ins. Corp.*, 699 N.W.2d 415, 419 (Neb. 2005) ("This court has never held that an injured person is a third-party beneficiary of a liability insurance policy insuring the tort-feasor."); *Charles v. Stout*, 308 P.3d 1138, 1141 (Alaska 2013) (construing tort victims as incidental beneficiaries); *Mercado v. Mitchell*, 264 N.W.2d 532, 538 (Wis. 1978) ("In the absence of express provisions in the policy or statutory provisions which can be read into the policy, a standard liability policy does not make the injured party a third-party beneficiary.").

[7] In *CX Reinsurance Co. Ltd. v. Leader Realty Co*., No. JKB 15-3054, 2018 WL 2020182, Slip Op. at 3 (D. Md. May 1, 2018), Chief Judge James Bredar stated that "a sub-strain of third-party beneficiary law apparently exists in Maryland because of a judicially created qualification of the doctrine."  Chief Judge Bredar explained that this "sub-strain of third-party beneficiary law" was apparently based on a public policy exception to contract interpretation whereby liability insurance contracts are interpreted "as expressing the insurer's and the insured's intent to make any potential tort claimant against the insureds an intended third-party beneficiary, [*Jones*, 356 Md. at 646 & n.4] even though the contract's language may not support such an inference."  *CX Reinsurance Co. Ltd*., slip op. at 3.  That interpretation of Maryland law supports our own conclusion that Maryland

(continued . . .)

on this point, we reject the Insurers' argument that to be an intended third-party beneficiary of an insurance policy, the injured party must first obtain a judgment or execute a settlement agreement with a covered insured. To support this argument, the Insurers rely on the language of the Policies themselves, which provide that

> [The Insurers] will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" . . . to which this insurance applies. We will have the right and duty to defend any "suit" seeking those damages. We may at our discretion investigate any "occurrence" and settle any claim or "suit" that may result.

The Insurers proceed to argue that "the Policies are indemnification contracts that do not obligate the insurer to pay anything, other than defense costs . . . unless, and until, *the*

---

appellate courts have indeed treated injured tort claimants as intended third-party beneficiaries in the liability insurance context.

We note that Chief Judge Bredar's opinion has not been published in the federal reporter. In prior reported opinions, this Court has stated that "it is the policy of this Court in its opinions not to cite for persuasive value any unreported federal or state court opinion." *Kendall v. Howard Cty.*, 204 Md. App. 440, 445 (2012), *aff'd*, 431 Md. 590 (2013); *see also Poe v. IESI MD Corp.*, 243 Md. App. 243, 256 n.2 (2019); *Oliveira v. Sugarman*, 226 Md. App. 524, 553 (2016), *aff'd*, 451 Md. 208 (2017); *Margolis v. Sandy Spring Bank*, 221 Md. App. 703, 718 n.3 (2015). The Court of Appeals has not adopted a similar policy. *See, e.g.*, *Gables Constr., Inc. v. Red Coats, Inc.*, 468 Md. 632, 663 (2020) (agreeing with an unreported decision of the United States District Court for the District of Maryland); *Finci v. Am. Cas. Co. of Reading, Pa.*, 323 Md. 358, 375-76 (1991) (citing as support "recent unreported decisions" of federal district courts that "have rejected FDIC's public policy contention").

In approving this opinion for reporting, the Court of Special Appeals announces that it is no longer the Court's policy to prohibit the citation of unreported opinions of federal courts or the courts of other states for persuasive value, provided that the jurisdiction that issued any particular opinion would permit it to be cited for that purpose. That change does not apply to unreported opinions of this Court, which remain governed by Maryland Rule 1-104.

20

*insured* becomes *legally* obligated to pay damages."

Although we note the novelty of the Insurers' argument, we are unaware of any authority, either in Maryland or elsewhere, that specifically requires an injured party to obtain a judgment or settlement against the tortfeasor as a prerequisite for intended third-party beneficiary status. Indeed, such a requirement would directly conflict with Part II of our opinion, where we will hold that an intended third-party beneficiary's rights vest at the time of injury. A rule requiring a party to obtain a judgment in order to become an intended beneficiary would be illogical where that party's rights vest at the time of injury. We therefore reject the Insurers' invitation to add such a requirement. Rather, based on the cases discussed above, we conclude that sound public policy dictates that liability insurance policies should be construed to protect injured tort claimants. This supports the notion that injured parties are intended beneficiaries of those policies as a matter of law, regardless whether they have obtained judgments or settlements. *See Jones*, 356 Md. at 646-47; *Phillips*, 156 Md. App. at 746. Accordingly, we hold that the Plaintiffs here are intended third-party beneficiaries of the Policies.[8]

---

[8] Although we hold that the Plaintiffs constitute intended third-party beneficiaries and, as such, have standing to pursue their declaratory judgment action, nothing in our opinion should be construed as suggesting that the Plaintiffs may proceed by filing direct actions against the Insurers in order to resolve their negligence claims. *See Harford Mut. Ins. Co.*, 344 Md. at 412. This is so because "public policy frowns upon the injection of liability insurance in legal proceedings at which the insured defendant's underlying tort liability is being determined[.]" *Id*. Although Maryland disfavors direct actions against insurers to resolve ultimate liability issues, appellate courts "have sanctioned 'declaratory

(continued . . .)

21

## II.    PLAINTIFFS' RIGHTS VESTED WHILE THE POLICIES WERE IN EFFECT

Having established that the Plaintiffs are intended third-party beneficiaries with rights to enforce the Policies (regardless whether they have obtained judgments or settlement agreements against the landlords), we must determine when those rights vested and whether the Rescission Settlement Agreements modified those rights.  The Insurers insist that, because the Plaintiffs are not intended third-party beneficiaries, they have never obtained vested rights to enforce the Policies.  The Plaintiffs disagree and argue that their rights to enforce the Policies vested at the time of their injuries.

We hold that, because the contracts at issue here are liability policies issued for the benefit of injured tort claimants (as explained in Part I, *supra*), the Plaintiffs' rights to enforce the Policies vested at the time of their injuries.  We further hold that the Rescission Settlement Agreements were wholly ineffective in modifying those vested rights.

Although we are aware of no Maryland authority directly on point regarding the vesting of a third-party beneficiary's rights in the context of an insurance policy, *Spates v. Spates*, 267 Md. 72, 77-79 (1972) provides a useful starting point for understanding third-

---

judgment actions by or against the tortfeasor's liability insurer, in advance of a determination of liability in a tort suit, . . . when the issues in the declaratory judgment action are independent and separable from the claims of the tort claimant[.]'"  *Id*. (quoting *Washington Metro. Area Transit Auth. v. Queen*, 324 Md. 326, 333 n.6 (1991)).  Regarding direct actions against insurers, Maryland has adopted a "direct action" statute.  *See* Ins. § 19-102(b)(2).  This statute allows an injured party to file a claim directly against an insurer, but only after the injured party has secured a judgment against the insured, but is unable to recover the full amount of the final judgment from the insured.

party beneficiary vesting. In *Spates*, a son sought to assert his rights as an intended third-party beneficiary of a separation agreement between his mother and father—namely, that pursuant to the separation agreement, the mother would convey her indivisible interest in real property to the father, and that the father would then grant his son an undivided 50% interest in that same property. *Id*. at 73-75. Notably, the son was a 17-year-old minor at the time the separation agreement was executed. *Id*. at 73. Although the Court ultimately held that the son's action against his father to enforce the separation agreement was barred by limitations, the Court first considered whether and when the son's rights to enforce the separation agreement vested. *Id*. at 77-78.

The Court noted that there were two different rules to consider regarding vesting: the general rule for adult beneficiaries; and a separate rule where the beneficiary was a minor when the contract was executed. The Court explained the general rule applicable to adult beneficiaries:

> While we have been referred to no Maryland case, the old Restatement rule is that the promisor and promisee can make no change in the promise made to a donee beneficiary unless such a power is reserved, Restatement, Contracts s 142, at 168 (1932). Nor can a change be made by the promisor and promisee in the promise made to a creditor beneficiary if he has changed his position in reliance on the promise, Restatement, Contracts s 143, at 168 (1932).

*Id*. The Court also recognized an exception applicable to minors: "once an infant is made the donee beneficiary of a contract between a promisor and promisee, his acceptance of the benefit is assumed, and his rights under the contract are indefeasible, unless he rejects the benefits, or a right to alter the provision made for him has been reserved[.]" *Id*. at 78 (citing 2 Williston on Contracts, § 356, p. 823 (3d ed. Jaeger 1959). The Court assumed, without

23

deciding, that the son's rights vested as a matter of law upon execution of the separation agreement pursuant to the rule applicable to minors, but proceeded to hold that the son's claim was barred by limitations.[9]  *Id.* at 79.

We pause here to note the *Spates* Court's use of the terms "donee beneficiary" and "creditor beneficiary."  The Restatement (First) of Contracts originally categorized "intended beneficiaries" into two groups: donee beneficiaries and creditor beneficiaries.  *Id.* at 77-78.  Under the Restatement (First) of Contracts § 133 (1932), a donee beneficiary obtained such status where the purpose of the promise was to make a gift to the beneficiary or to confer upon her a right against the promisor.  A creditor beneficiary, on the other hand, obtained such status by virtue of the fact that performance of the promise would satisfy an actual or asserted duty that the promisee owed to the beneficiary.

Notably, under the Restatement (First) of Contracts, the promisor and promisee could not modify an agreement to the detriment of a donee beneficiary unless such power was expressly reserved in the agreement.  Restatement (First) of Contracts § 142.  As to creditor beneficiaries, the promisor and promisee could not modify the agreement after the

---

[9] We note that the exception for minors likely applies here—apparently all Plaintiffs were minors during their tenancies at the properties when the Policies were in effect.  The minor rule recognized in *Spates* therefore arguably provides an alternative basis to affirm the circuit court's declaratory judgment that the Plaintiffs' rights vested at some point prior to execution of the Rescission Settlement Agreements.  This issue is complicated by the fact that injured tort plaintiffs do not fit neatly into either the donee or creditor beneficiary classifications.  We need not resolve this issue because, as we discuss *infra*, we shall hold that the Plaintiffs' rights vested upon suffering injuries on the insured premises.

24

creditor beneficiary materially changed her position in reliance on the promise.
Restatement (First) of Contracts § 143.

The *Spates* Court noted that a tentative draft of the Restatement (Second) of Contracts proposed eliminating the distinction between donee and creditor beneficiaries, and would instead only distinguish between "intended" and "incidental" beneficiaries. 267 Md. at 77-78 n.3. The *Spates* Court observed that the:

> Restatement (Second), Contracts s 142 (Tent. Draft No. 3, 1967) eliminates this distinction [between donee and creditor beneficiaries] and provides that modification by the promisor and promisee is ineffective only if the agreement so provides, unless the third-party beneficiary has changed his position in reliance on the promise or has manifested assent to it.

*Id*. at 78. The current version of the Restatement (Second) of Contracts § 311 addresses the modification of an intended third-party beneficiary's rights, and provides:

> (1) Discharge or modification of a duty to an intended beneficiary by conduct of the promisee or by a subsequent agreement between promisor and promisee is ineffective if a term of the promise creating the duty so provides.
>
> (2) In the absence of such a term, the promisor and promisee retain power to discharge or modify the duty by subsequent agreement.
>
> (3) Such a power terminates when the beneficiary, before he receives notification of the discharge or modification, materially changes his position in justifiable reliance on the promise or brings suit on it or manifests assent to it at the request of the promisor or promisee.
>
> (4) If the promisee receives consideration for an attempted discharge or modification of the promisor's duty which is ineffective against the beneficiary, the beneficiary can assert a right to the consideration so received. The promisor's duty is discharged to the extent of the amount received by the beneficiary.

Thus, the donee and creditor beneficiary statuses identified in the Restatement (First) of Contracts have been subsumed by the broader "intended beneficiary" category in the

25

Restatement (Second), and the general rule regarding the vesting of rights is meant to apply to that new, broader category.

We note that in Part I of our opinion we made no effort to distinguish between donee and creditor beneficiaries when we determined that the Plaintiffs constitute intended third-party beneficiaries. Indeed, the Plaintiffs themselves have never asserted that they should be so classified. This is not surprising. Numerous commentators have expressed concern or disagreement with the Restatement (First) of Contracts' two categories for all possible intended third-party beneficiaries. *See* David M. Summers, *Third Party Beneficiaries and the Restatement (Second) of Contracts*, 67 Cornell L. Rev. 880, 880-81 (1982) ("The first Restatement attempted to supply a theoretical basis for third party recovery by defining two categories of beneficiaries who could enforce a contract: donees and creditors. Courts soon found, however, that many third party beneficiaries could not be classified within the two categories." (footnotes omitted)); Jessica Ansell Hauser, *Nonconsensual Repeal of Third-Party Beneficiary Contract Rights: Senior Creditors Under Subordination Agreements*, 8 Cardozo L. Rev. 1227, 1230-31 (1987) ("The Restatement's distinction between creditor and donee beneficiaries was almost useless. Courts found it increasingly difficult to protect parties for whom third-party contracts were drafted while limiting parties to the two assigned categories."); Note, *The Third Party Beneficiary Concept: A Proposal*, 57 Colum. L. Rev. 406, 417-18 (1957) ("The reasons advanced for the distinction in legal relations created by the 'donee' or 'creditor' labels do not appear to carry much weight." (footnote omitted)).

The American Law Institute, which publishes the Restatement, recognized the limitations of the donee/creditor beneficiary categories at its 44th Annual Meeting on May 18, 1967. In discussing a tentative draft of the Restatement (Second) of Contracts, Professor Robert Braucher, a Reporter, discussed the problems with classifying all third-party beneficiaries as either donees or creditors. ALI Proceedings 306 (1967). Professor Braucher explained that there were some "fringe cases" where the donee and creditor categories did not neatly fit, such as in the case of mortgagees or materialmen, and suggested using the term "intended beneficiary" to encompass every type of beneficiary who could enforce a contract. *Id*. at 305-07.

Though not specifically contemplated at that ALI Proceedings session, an injured tort claimant seeking to enforce a liability insurance policy would appear to constitute what Professor Braucher deemed a "fringe" case. It is difficult to classify a tort claimant as either a donee or creditor beneficiary, and the "vesting" rule concerning manifestations of assent or changing one's position in reliance of the agreement would be extremely difficult to apply to an injured third party seeking to recover pursuant to a liability policy.[10]

---

[10] We note that no Maryland appellate court has expressly endorsed the Restatement (Second) of Contracts § 311's abandonment of the donee/creditor categories. Despite the inherent limitations in reducing all forms of intended beneficiaries into these two categories, nothing in this opinion should be construed as disavowing the donee/creditor beneficiary statuses. Indeed, the Court of Appeals continues to recognize them. *See Lovell Land, Inc.*, 408 Md. at 263-64 (noting that "elimination of the donee/creditor categories and the lumping of protected beneficiaries into one broad class" presents its own challenges). We merely note that there are intended beneficiaries who fall outside a strict interpretation of the donee/creditor beneficiary classifications.

27

Although we could hypothesize scenarios where an injured third-party beneficiary could manifest assent to a liability policy or demonstrate detrimental reliance on the terms of the policy, we are confident that those fact patterns would be rare in practice. Indeed, the Restatement (Second) apparently recognized the limitations of its general "vesting" rule. The Restatement (Second) of Contracts § 311 Comment e. proposes a different approach where the beneficiary is an injured tort claimant and the contract is an insurance policy. Comment "e" provides:

> *Effect of loss under insurance policy.* The terms of the promise may make the beneficiary's right irrevocable in whole or in part or only upon a condition. Thus a reserved power to change the beneficiary of a life insurance policy terminates on the death of the insured. *In general the power of promisor and promisee to vary the duty to a beneficiary under other types of insurance policies is understood to be subject to a similar limitation: when an insured loss occurs, the power to vary the terms of the policy with respect to that loss is terminated.*
> **Illustration:**
> 5. A contracts with B for liability insurance covering any person operating A's automobile with A's permission. C incurs liability covered by the policy. Thereafter A and B agree to rescind the policy. The attempted rescission does not affect the rights of C *or the person to whom he is liable.*

(Emphasis added). This language captures two important principles that differ from the general vesting rule that requires manifestation of assent or detrimental reliance: the beneficiary's rights vest when the loss or injury occurs, and the insurer and insured lose their ability to modify the policy upon the occurrence of injury or loss.

Although we are aware of no Maryland authority expressly adopting the Restatement (Second) of Contracts § 311 or Comment e., the overwhelming weight of authority agrees that the intended beneficiary of a liability policy obtains a vested right in that policy at the time of injury, and that the insured and insurer may not subsequently

28

modify that vested right. For example, Appleman on Insurance simply states that "it is the general rule that an injured person's rights cannot be defeated by a cancellation or settlement after an accident has occurred." 8B J.A. Appleman & J. Appleman, *Insurance Law and Practice* § 5020, at 515-16 (1981).

Additionally, Couch on Insurance, when discussing whether the insured and insurer may modify an insurance policy to the detriment of an injured third-party, states:

> Where the contract of insurance provides for liability to third persons, the insurer and the insured cannot terminate such a contract by their voluntary action to the prejudice of a claimant's rights which have already vested. Illustrative of the foregoing, it has been held that a compensation policy cannot be cancelled by the insurer, even with the assent of the insured, after an injured employee's rights thereunder have accrued, and even if the employee did not have actual knowledge of the existence of the policy or his or her rights thereunder since the employee is presumed to have accepted the benefits of the policy.

2 *Couch on Insurance* § 31:49 (3d ed. 2020) (footnotes omitted). In support of the notion that the insured and insurer may not modify a beneficiary's vested rights, Couch cites to several cases that have recognized that the injured party's right to enforce vested at the time of the injury. *See Direct Auto Ins. Co. v. Bahena*, 131 N.E.3d 1094, 1106 (Ill. App. Ct. 2019) (stating that Illinois public policy "dictates that insurance is 'not necessarily a private matter between an insurer and its insured,' and as such, an injured party's rights against the liability insurer vests at the moment of the accident giving rise to the underlying claim." "The injured party's vested rights cannot be 'defeated by the joint efforts of the insured and the insurer.'" (citations omitted) (citing *State Farm Fire & Casualty Co. v. Perez*, 899 N.E.2d 1231, 1234 (Ill. App. Ct. 2008))); *Strojnik v. Gen. Ins. Co. of Am.*, 36 P.3d 1200, 1205 (Ariz. Ct. App. 2001) (construing state statute as prohibiting "an insurer

29

and its insured, after the occurrence of any 'injury, death or damage' for which the insured may be liable, from invalidating their insurance policy as of a date prior to the covered event."); *Detroit Auto. Inter-Ins. Exch. v. Ayvazian*, 233 N.W.2d 200, 203 (Mich. Ct. App. 1975) ("The liability of the insurer with respect to insurance . . . becomes absolute whenever injury or damage covered by such policy occurs. The policy may not be canceled or annulled as to such liability by agreement between the insurer and the insured after the occurrence of the injury or damage" (citing 1 Long, *The Law of Liability Insurance*, § 3.25 pp. 3-83-84)); *Rendelman v. Levitt*, 24 S.W.2d 211, 214 (Mo. Ct. App. 1930) (stating that "[A]n attempted cancellation or rescission of a policy, issued under [the Worker's Compensation Act], after an injury to an employee has occurred, though assented to by the employer, cannot defeat the right of the employee to recover on the policy," and the doctrine allowing rescission of a contract prior to the third-party's acceptance or detrimental reliance "has no application here."); *Cosmopolitan Mut. Ins. Co. v. Lumbermen's Mut. Cas. Co.*, 228 N.E.2d 893, 895 (N.Y. 1967) ("It is clear that Lumbermen's, while it was the only insurance carrier protecting the insured, could not have effectively cancelled the binder insofar as the injured party was concerned after June 19, the date of the accident. The right of Higgins, the injured party, to proceed against Lumbermen's had fully matured at that time."); *Chandler v. Valentine*, 330 P.3d 1209, 1212-14 (Okla. 2014) (holding that under Oklahoma statute's prohibition on retroactive annulment of policy, an insurer may not cancel a "claims made" policy where insurer knew of pending wrongful death claim.).

In addition to the cases cited in Couch, Plaintiffs have provided other out-of-state cases that support the proposition that a beneficiary's right to enforce vests at the time of injury. *See Douglass v. Nationwide Mut. Ins. Co.*, 913 S.W.2d 277, 282 (Ark. 1996) (stating that "While we uphold the right of an insurance company to rescind coverages based on fraud by the insured without consent of the insured or a declaratory judgment, we underscore the point that this right is unavailable when third-party claims are at issue."); *Farm & City Ins. Co. v. Coover*, 225 N.W.2d 335, 337 (Iowa 1975) (stating that Iowa's direct action statute, which provided that an injured person who obtains judgment against an insured may sue the insurer directly, also gives an injured third party an interest in the liability policy at the time of injury, and that the statute "does not permit the insurer and insured to do anything by litigation or agreement between them alone to abrogate or compromise coverage existing at the time of the accident"); *Indem. Co. of Am. v. Pitts*, 58 S.W.2d 53, 54 (Tex. Comm'n App. 1933) (holding that with regard to insurer and insured's attempted cancellation of policy, "[t]hat [the injured party], without her consent, could not be deprived of her rights against the [insurer], by agreement between [the insured and the insurer] after her rights had accrued, is perfectly plain. [The injured party's] rights against the company, subject to the terms and conditions of the policy, accrued the moment the liability of [the insured] for the personal injuries suffered by her arose."); *Finkelberg v. Cont'l Cas. Co.*, 219 P. 12, 14 (Wash. 1923) (stating that the insured "could neither destroy the rights of [the intended third-party beneficiary] by his agreement with [the insurer] nor by his neglect to give notice to [the insurer]").

31

In summary, there is substantial authority for the proposition that an injured third party's rights to enforce a liability insurance policy vest at the time of injury, and that the insured and insurer may not subsequently modify that policy to the detriment of the third party. To permit an insurer and insured to enter into an agreement to defeat the injured party's rights under the policy would defy logic. Plaintiffs, as intended third-party beneficiaries of the Policies, obtained vested rights in those Policies when they suffered their injuries. Because those rights vested at the time of the injuries, the Insurers and landlords could not subsequently modify them pursuant to the Rescission Settlement Agreements.[11]

## CONCLUSION

We hold that, in the context of a liability insurance policy, an injured tort claimant constitutes an intended third-party beneficiary. We further hold that the injured tort claimant's rights to enforce the policy vest at the time of injury, and that the insurer and insured may not subsequently modify those rights after they have vested. The Plaintiffs in this case therefore constitute intended third-party beneficiaries of the Policies. Their rights to enforce the Policies vested upon suffering their injuries at the landlords' properties.

---

[11] We note that the Insurers have provided no affirmative authority to the contrary, *i.e.*, they have failed to cite any authority stating that a third-party beneficiary's rights do not vest at the time of injury in the context of a liability policy. Rather, Insurers simply double-down on their argument that Plaintiffs must first obtain a judgment as a condition precedent to suing the Insurers. The Insurers further argue that the recognition of vested rights at the time of injury would undermine Maryland's public policy favoring settlement of litigation. In this narrow circumstance, however, we believe that the public policy of protecting tort plaintiffs' rights outweighs the policy that favors settlements.

32

Finally, the Insurers and landlords could not, by virtue of the Rescission Settlement

Agreements, modify or undermine those vested rights.  Accordingly, we affirm.[12]

**JUDGMENT OF THE CIRCUIT COURT
FOR BALTIMORE CITY AFFIRMED.
COSTS TO BE PAID BY APPELLANTS.**

---

[12] We recognize that, "[a]s the third party beneficiary of the insurance contract, the claimant stands in the shoes of the insured wrongdoer and vis-à-vis the insurer his rights are no greater than those of the insured's." *Travelers Ins. Co*., 260 Md. at 674 (citing *Shillman*, 249 Md. at 690).  Thus, if the Policies were void *ab initio* due to the landlords' fraudulent misrepresentations, then the Plaintiffs would not be able to recover damages from the Insurers because they would stand in the shoes of the allegedly uninsured landlords.  Nevertheless, nowhere in the declaratory judgment action in the circuit court did the Insurers seek their own declaration that the Policies were void *ab initio*, and that the Plaintiffs are therefore unable to enforce the Policies against them.  Nor did the Insurers raise any such argument in this Court.  Accordingly, because this issue is not before us, we express no opinion on it.